Mr. Justice DAVIS
delivered the opinion of the court.
On the 10th day of May, 1865, Lambdin P. Milligan presented a petition to the Circuit Court of the United States for the District of Indiana, to be discharged from an alleged unlawful imprisonment. The case made by the petition is this: Milligan is a citizen of the United States; has lived for twenty years in Indiana; and, at the time of the grievances complained of, was not, and never had been in the military or naval service of the United States. On the 5th day of October, 1864, while at home, he was aiuested by order of General Alvin P. Hovey, commanding the military district of Indiana; and has ever since been kept in close confinement.
On the 21st day of October, 1864, he was brought before a military commission, convened at Indianapolis, by order of General TIovey, tried on certain charges and specifications ; found guilty, and sentenced to be hanged; and the sentence ordered to be executed on Eriday, the 19th day of May, 1865.
On the 2d day of January, 1865, after the proceedings of the military commission were at an end, the Circuit Court of the United States for Indiana met at Indianapolis and empanelled a grand jury, who were charged to inquire *108 whether the laws of the United States had been violated; and, if so, to make presentments. The court adjourned on the 27th day of January, having, prior thereto, discharged from further service the grand jury, who did not find any hill, of indictment or make any presentment against Milligan for any offence whatever; and, in fact, since his imprisonment, no bill of indictment has been found or presentment made against him by any grand jury of the United States.
Milligan insists that said military commission had no jurisdiction to try' him upon the charges preferred, or upon any charges whatever; because he was a citizen of the United States and the State of Indiana, and had not been, since the commencement of the late Rebellion, a resident of any of the States whose citizens were arrayed against the government, and that the right of trial by jury was guaranteed'to him by the Constitution of the United States.
The prayer of the petition was, that under the act of Congress, approved March 3d, 1863, entitled, “ An act relating to habeas corpus and regulating judicial proceedings in cei--tain cases,” he may be brought befoi’e the court, and either turned over to the proper civil tribunal to be pi’ococded against according to the law of the land or discharged from custody altogether.
"With the petition were filed the order for the commission, the charges and specifications, the findings of the court, with the order of the War Department reciting that the sentence was appi’oved by the President of the United States, and directing that it be carried into execution without delay. The petition was presented and filed in open court by the counsel for Milligan; at the same time the District Attorney of the United States for Indiana appeared, and, by the agreement of counsel, the application was submitted to the court. The opinions of the judges of the Circuit Court were opposed on three questions, which are cei'tified to the Supreme Court:
1st. “ On the facts stated in said petition and exhibits, ought a writ of habeas corpus to be issued ?”
*109 2d. “ On the facts stated in said petition and exhibits, ought the said Lambdin P. Milligan to be discharged from custody as in said petition prayed ?”
8d. “ Whether, upon the facts stated in said petition and exhibits, the military commission mentioned therein had jurisdiction legally to try and sentence said Milligan in manner and form as in said petition and exhibits is stated ?”
The importance of the main question presented by this record cannot be overstated; for it involves the very framework of the government and the fundamental principles of American liberty.
During the late wicked Rebellion, the temper of the times did not allow that calmness in deliberation and discussion so necessary to a correct conclusion of a purely judicial question. Then, considerations of safety were mingled with the exercise of power; and feelings and interests prevailed which are happily terminated. Now that the public safety is assured, this question, as well as all others, can bo discussed and decided without passion or the admixture of any element not required to form a legal judgment. We approach the investigation of this case, fully sensible of the magnitude of the inquiry and the necessity of full and cautious deliberation.
But, we are met with a preliminary objection. It is insisted that the Circuit Court of Indiana had no authority to certify these questions; and that we are without jufisdiction to hear and determine them.
The sixth section of the “Actto amend the judieiál system of the United States,” approved April 29,1802, declares “that whenever any question shall occur before a Circuit Court upon which the opinions of the judges shall be opposed, the point upon which the disagreement shall happen, shall,-during the same term, upon the request of either party or their counsel, be stated under the direction of the judges and certified under the seal of the court to the Supreme Court at their next session to be held thereafter; and shall by the said court be finally decided: And the decision of the *110 Supreme Court and their order in the premises shall be remitted to the Circuit Court and he there entered of record, and shall have effect according to the nature of the said judgment and order: Provided, That nothing herein contained shall prevent the cause from proceeding, if, in the opinion of the court, further proceedings can be had without prejudice to the merits.”
It is under this provision of law, that a Circuit Court has authority to certify any question to the Supreme Court for adjudication. The inquiry, therefore, is, whether the case of Milligan is brought within its terms.
It was admitted at the bar that the Circuit Court had jurisdiction to entertain the applicatiou for the writ of habeas corpus and to hear and determine it; and it could not be denied; for the power is expressly given in the 14th section of the Judiciary Act of 1789, as well as in the later act of 1868. Chief Justice Marshall, in Bollman’s case,* construed this branch of the Judiciary Act to authorize the courts as well as the judges to issue the writ for the purpose of inquiring into the cause of the commitment; and this construction has never been departed from. But, it is maintained with earnestness and ability, that a certificate of division of opinion can occur only in a cause; and, that the proceeding by a party, moving for a writ of habeas corpus, does not become a cause until after the writ has been issued and a return made.
Independently of the provisions of the act of Congress of March 8, 1868, relating to habeas corpus, on which the petitioner bases his claim for relief, and which we will presently consider, can this position he sustained?
It is true, that it is usual for a court, on application for a writ of habeas corpus, to issue the writ, and, on the return, to dispose of the case; but the court can elect to waive the issuing of the writ and consider whether, upon the facts presented in the petition, the prisoner, if brought before it, could be discharged. One of the very points on which, the case of Tobias "Watkins, reported in 3 Peters,† turned, was, *111 ■whether, if the writ was issued, the petitioner would he remanded upon the ease which he had made.
The Chief Justice, in delivering the opinion of the court, said: “ The cause of imprisonment is shown as fully hy the petitioner as it could appear on the return of the writ; consequently the writ ought not to be awarded if the court is satisfied that the prisoner would be remanded to prison.”
The judges of the Circuit Court of Indiana were, therefore, warranted by an express decision of this court in refusing the writ, if satisfied that the prisoner on his own showing was rightfully detained.
But it is contended, if they differed about the lawfulness of the imprisonment, and could render no judgment, the prisoner is remediless; and cannot have the disputed question certified under the act of 1802. Ilis remedy is complete by writ of error or appeal, if the court renders a final judgment refusing to discharge him; but if he should be so unfortunate as to be placed in the predicament of having the court divided on the question whether he should live or die, he is hopeless and without remedy. He wishes the vital question settled, not by a single judge at his chambers, but by the highest tribunal known to the Constitution; and yet the privilege is denied him; because the Circuit Court consists of two judges instead of one.
Such a result was not in the contemplation of the legislature of 1802; and the language used by it cannot be construed to mean any such thing. The clause under consideration was introduced to further the ends of justice, by obtaining a speedy settlement of important questions where the judges might be opposed in opinion.
The act of 1802 so changed the judicial system that the Circuit Court, instead of three, was composed of two judges; and, without this provision or a kindred one, if the judges differed, the difference would remain, the question be unsettled, and justice denied. The decisions of this court upon the provisions of this section have been numerous. In United States v. Daniel,* the court, in holding that a division *112 of the judges ou a motion for a new trial could not be certified, say: “That the question must be one which arises in a cause depending before the court relative to a proceeding belonging to the cause.” Testing Milligan’s case by this rule of law, is it not apparent that it is rightfully here; and that we are compelled to answer the questions on which the judges below were opposed in opinion ? If, in the sense of the law, the proceeding for the writ of habeas corpus was the 11 cause” of the party applying for it, then it is evident that the “cause” was pending before the court, and that the questions certified arose out of it, belonged to it, and were matters of right and not of discretion.
But it is argued, that the proceeding does not ripen into a cause, until there are two parties to it.
This we deny. It was the cause of Milligan when the petition was presented to the Circuit Court. It would have been the cause of both parties, if the court had issued the writ and brought those who held Milligan in custody before it. "Webster defines the word “cause” thus: “A suit or action in court; any legal process which a party institutes to obtain his demand, or by which'he seeks his right, or supposed right” — and he says, “this is a legal, scriptural, and popular use of the word, coinciding nearly with case, from caclo, and action, from ago, to urge and drive.”
In any legal sense, action, suit, and cause, are convertible terms. Milligan supposed he had a right to test the validity of his trial and sentence; and the proceeding which he set in operation for that purpose was his “cause” or “suit.” It was the only one by which he could recover his liberty. He was powerless to do more; he could neither instruct the judges nor control their action, and should not suffer, because, without fault of his, they' were unable to render a judgment. But, the true meaning to the term “suit” has been given by this court. One of the questions in Weston v. City Council of Charleston,* was, whether a writ of prohibition was a suit; and Chief Justice Marshall says: “The *113 term is certainly a comprehensive one, and is understood to apply to any proceeding in a court of justice by which an individual pursues that remedy which the law affords him.” Certainly, Milligan pursued the only remedy which the law afforded him.
Again, in Cohens v. Virginia,* he says: “In law language a suit is the prosecution of some demand in a court of justice.” Also, “To commence a suit is to demand something by the institution of process in a court of justice; and to prosecute the suit is to continue that demand.” When Milligan demanded Ms release by the proceeding relating to habeas corpus, he commenced a suit; and he has since prosecuted it in all the ways known to the law. One of the questions in Holmes v. Jennison et al.† was, whether under the 25th section of the Judiciary Act a proceeding for a writ of habeas corpus was a “ suit.” Chief Justice Taney held, that, “if a party is unlawfully imprisoned, the writ of habeas corpus is his appropriate legal remedy. It is his suit in court to recover his liberty.” There was much diversity of opinion on another ground of jurisdiction; but that, in the sense of the 25th section of the Judiciary Act, the proceeding by habeas corpus was a suit, was not controverted by any except Baldwin, Justice, and he thought that “suit” and “cause” as used in the section, mean the same thing.
The court do not say, that a return must be made, and the parties appear and begin to try the case before it is a suit. When the petition is filed and the writ prayed for, it is a suit, — the suit of the party making the application. If it is a suit under the 25th section of the Judiciary Act when the proceedings are begun, it is, by all the analogies of the law, equally a suit under the 6th section of the act of 1802.
But it is argued, that tk'ere must be two parties to the suit, because the point is to be stated upon the request of “ either party or their counsel.”
Such a literal and technical construction would defeat the very purpose the legislature had in view, which was to ena *114 ble any party to bring the case here, when the point in controversy was a matter of right an cl not of discretion; and the words “ either party,” in order to prevent a failure of justice, must be construed as words of enlargement, and not of restriction. Although this case is here ex parte, it was not considered by the court below without notice having been given to the party supposed to have an interest in the detention of the prisoner. The statements of the record show that this is not only a fair, but conclusive inference. 'When the counsel for Milligan presented to the court the petition for the writ of habeas corpus, Mr. Iianna,, the District Attorney for Indiana, also appeared; and, by agreement, the application was submitted to the court, who took the case under advisement, and on the next day announced their inability to agree, and made the certificate. It is clear that Mr. Hanna did not represent the petitioner, and why is his appearance entered? It admits of no other solution than this, — that he w:as informed of the application, and appeared on behalf of the government to'contest it. The government was the prosecutor of Milligan, who claimed that his imprisonment was illegal; and sought, in the only way he could, to recover his liberty. The case was a grave one; and the court, unquestionably, directed that the law officer of the government should be informed of it. He very properly appeared, and, as the facts were uncontroverted and the difficulty was in the application of the law, there was no useful purpose to ' be obtained in issuing the writ. The cause was, therefore, submitted to the court for their consideration and determination.
But Milligan claimed his discharge from custody by virtue of the act of Congress “ relating to habeas corpus, and regulating judicial proceedings in certain cases,” approved March 3d, 1863. Did that act confer jurisdiction on the Circuit Court <of Indiana to hear this case ?
In interpreting a law, the motives which must have operated with the legislature in passing it are proper to be considered. This law was passed in a time of great national peril, when our heritage of free government was in danger. *115 An armed rebellion against the national authority, of greater proportions than history affords an example of, was raging; and the public safety required that the privilege of the writ of habeas corpus should he suspended. The President had practically suspended it, and detained suspected persons in custody without trial; but his authority to do this was questioned. It was claimed that Congress alone could exercise, this power; and that the legislature, and not the President, should judge of the political considerations on which the right to suspend it rested. The privilege of this great writ had never before been withheld from the citizen; and as the exigence of the times demanded immediate action, it was of the highest importance that the lawfulness of the suspension should be fully established. It was under thesé circumstances, which were such as to arrest the attention of the country, that this law vTas passed. The President was authorized by it to suspend the privilege of the writ of habeas corpus, whenever’, in his judgment, the public safety required; and he did, by proclamation, bearing date the 15th of September, 1863, reciting, among other things, the authority of this statute, suspend it. The suspension of the writ does not authorize the arrest of any one, but simply denies to one arrested the privilege of this writ in order to obtain his liberty.
It is proper, therefore, to inquire under what circumstances the courts could rightfully refuse to grant this writ, and when the citizen was at liberty to'invoke its aid.
The second and third sections of the law are explicit on these points. The language used is plain and direct, and the meaning of the Congress cannot be mistaken. The public safety demanded, if the President thought proper to arrest a suspected person, that he should not be required to give the cause of his detention on return to a writ of habeas corpus. But it was not contemplated that such person should be detained in custody beyond a certain fixed period, unless certain judicial proceedings, known to the common law, were commenced against him. The Secretaries of State and War were directed to furnish to the judges of the courts of the *116 United States, a list of the names of all parties, not prisoners of war, resident in their respective jurisdictions, who then were or afterwards should be held in custody by the authority of the President, and who were citizens of states in which the administration of the laws in the Federal tribunals was unimpaired. After the list was furnished, if a grand jury of the district convened and adjourned, and did not indict or present one of the persons thus named, he was entitled to his discharge; and it was the duty of the judge of the court to order him brought before him to be discharged, if he desired it. The refusal or omission to furnish the list could not operate to the injury of any one who was not indicted or presented by the grand jury; for, if twenty days had elapsed from the time of his arrest and the termination of the session of the grand jury, he was equally entitled to his discharge as if the list were furnished; and any credible person, on petition verified by affidavit, could obtain the judge’s order for that purpose.
Milligan, in his application to be released from imprisonment, averred the existence of every fact necessary under the terms of this law to give the Circuit Court of Indiana jurisdiction. If he was detained in custody by the order of the President, otherwise than as a prisoner of war; if he was a citizen of Indiana and had never been in the military or naval service, and the grand jury of the district had met, after he had been arrested, for a period of twenty days, and adjourned without taking any proceedings against him, then the court had the right to entertain his petition and determine the lawfulness of his imprisonment. Because the word “ court” is not found in the body of the second section, it was argued at the bar, that the application should have been made to a judge of the court, and not to the court itself; but this is not so, for power is expressly conferred in the last proviso of the section on the court equally with a judge of it to discharge from imprisonment. It was the manifest design of Congress to secure a certain remedy by which any one, deprived of liberty, could obtain it, if there was a judicial failure to find cause of offence against him. Courts are *117 not, always, in session, ‘^ind can adjourn on the discharge of the grand jury; and before those, who are in confinement, could take proper steps to procure their liberation. To provide for this contingency, authority was given to the judges out-of court to grant relief to any party, who could show, that, under the law, he should be no longer í-estrained of his liberty.
It was insisted that Milligan’s case was defective, because it did not state that the list was furnished to the judges; and, therefore, it was impossible to say under which section of the act it was presented.
It is not easy to see how this omission could affect the question of jurisdiction. Milligan could not know that the list was furnished, unless the judges volunteered to tell him; for the law did not require that any record should be made of it or anybody but the judges informed of it. "Why aver the fact when the truth of the matter was apparent to the court without an averment? How can Milligan be harmed by the absence of the averment, when he states that he was under arrest for more- than sixty days before the court and grand jury, which should have considered his case, met at Indianapolis ? It is apparent, therefore, that under the Ha-beas Corpus Act of 1868 the Circuit Court of Indiana had complete jurisdiction to adjudicate upon this case, and, if the judges could not agree on questions vital to the progress of the cause, they had the authority (as we. have shown in a previous part of this opinion), and it was their duty to cei’-tifv those questions of disagreement to this court for final decision. It was argued that a final decision on the questions presented ought not to be made, because the parties who were directly concerned in the arrest and detention of Milligan, were not before the court; and their rights might be prejudiced by the answer which should be given to those questions. But this court cannot know what return will be made to the writ of habeas corpus when issued; and it is very clear that no one is concluded upon any question that may be raised to that return. In the sense of the law of 1802, which authorized a certificate of division, a final decision *118 means final upon the points certified; final upon the court below, so that it is estopped from any adverse ruling in all the subsequent proceedings of the cause.
But it is said that this- case is ended, as the presumption is, that Milligan was hanged in pursuance of the order of the President.
Although we have no judicial information on the subject, yet the inference is that he is alive; for otherwise learned counsel would not appear for him and urge this court to decide his case. It can never be in this country of written constitution and laws, with a judicial department to interpret them, that any chief magistrate would be so far forgetful of his duty', as to order the execution of a man who denied the jurisdiction that tried and convicted him; after his case was before Federal judges with power to decide it, who, being unable to agree on the grave questions involved, had, according to known law, sent it to the Supreme Court of the United States for decision. But even the suggestion is injurious to the Executive, and we dismiss it from further consideration. There is, therefore, nothing to hinder this court from an investigation of the merits of this controversy.
The controlling question in the case 'is this: Upon the facts stated in Milligan’s petition, and the exhibits filed, had the military commission mentioned in it jurisdiction, legally, to try and sentence him ? Milligan, not a resident of one of the rebellious states, or a prisoner of war, but a citizen of 'Indiana for twenty years past, and never in the military or naval service, is, while at his home, arrested by the military power of the United States, imprisoned, and, on certain criminal charges preferred against him, tried, convicted, and sentenced to be banged by a military commission, organized under the direction of the military commander of the military disti’ict of Indiana. Had this tribunal the legal power and authority to try and punish this man ?
Ho graver question was ever considered by this court, nor one which more nearly concerns the rights of the whole *119 people; for it is "the birthright of every American citizen when charged with crime, to be tried and punished according to law. The power of punishment is, alone through the means which the laws have provided for that purpose, and if they are ineffectual, there is an immunity from punishment, no matter how great an offender the individual may be, or how much his crimes may have shocked the sense of justice of the country, or endangered its safety. By the protection of the law human rights are secured; withdraw that protection, and they are at the mercy of wicked rulers, or the clamor of an excited people. If there was law to justify this military trial, it is not our province to interfere; if there was not, it is our duty to declare the nullity of the whole proceedings. The decision of this question does not depend on argument or judicial precedents, numerous and highly illustrative as they are. These precedents inform us of the extent of the struggle to preserve liberty and to relieve those in civil life from military trials. The founders of our government were familiar with the history of that struggle; and secured in a written constitution every right which the people had wrested from power during a contest of ages. By that Constitution and the laws authorized by it this question must be determined. The provisions of that instrument on the administration of criminal justice are too plain and direct, to leave room for misconstruction or doubt of their true meaning. Those applicable to this case are found in that clause of the original Constitution which says, “ That the trial of all crimes, except in case of impeachment, shall be by jury;"’ and in the fourth, fifth, and sixth articles of the amendments. The fourth proclaims the right to be secure in'person and effects against unreasonable search and seizure; and directs that a judicial warrant shall not issue “without proof of probable cause supported by oath or affirmation.” The fifth declares “ that no person shall be held to answer for a capital or otherwise infamous crime unless on presentment by a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of Avar or public danger, nor be do- *120 privecl of life, liberty, or property, without clue process of law.” And. the sixth guarantees the right of trial by jury, in such manner and with such regulations that with upright judges, impartial juries, and an able bar, the innocent will be saved and the guilty punished. It is in these words-: “In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence.” These securities for personal liberty thus embodied, were such as wisdom and experience had demonstrated to be necessary for the protection of those accused of crime. And so strong was the sense of the country of their importance, and so jealous were the people that these rights, highly prized, might be denied them by implication, that when the original Constitution was proposed for adoption it encountered severe opposition; and, but for the belief that it would be so amended as to embrace them, it would never have been ratified.
Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are now, after the lapse of more than seventy years, sought to be avoided. Those groat and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable' law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers- and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times. *121 and under all circumstances. Eo doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as lias been happily proved by the result- of the great effort to throw off its just authority.
Have any of the rights guaranteed by the Constitution been violated in the case of Milligan ? and if so, what are they ?
Every trial involves the exercise of judicial power; and from what source did the military commission that tried him derive their authority? Certainly no part of the judicial power of the country was conferred on them; because the Constitution expressly vests it “ in one supreme court and such inferior courts as the Congress may from time to time ordain and establish,” and it is not pretended that the commission was a court ordained and established by Congress. They cannot justify on the mandate of the President; because he is controlled by law, aiid has his appropriate sphere of duty, which is to execute, not to make, the laws; and there is “ no unwritten criminal code to which resort can be had ás a source of jurisdiction.”
But it is said that the jurisdiction is complete under the “ laws and usages of war.”
It can serve no useful purpose to inquire what those laws and usages are, whence they originated, where found, and on whom they operate; they can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed. This court has judicial knowledge that in Indiana the Federal authority was always unopposed, and its courts always open-to hear criminal accusations and redress grievances; and no usage of war could sanction a military trial there for any offence whatever of a citizen in civil life, in nowise *122 connected with the military service. Congress could grant no such power; and to the honor of our national legislature be it said, it has never been provoked by the state of the country even to attempt its exercise. One of the plainest constitutional provisions was, therefore, infringed when Mil-ligan was tried by a court not ordained and established by Congress, and not composed of judges appointed during good behavior.
"Why was he not delivered to the Circuit Court of Indiana to be proceeded against according to law ? Ho reason of necessity could be urged against it; because Congress had declared penalties against the offences charged, provided for their punishment, and directed that court to hear and determine them. And soon after this military tribunal 'was ended, the Circuit Court met, peacefully transacted its business, and adjourned. It needed no bayonets to protect it, and required ho military aid to execute its judgments. It was held in a state, eminently distinguished for patriotism, by judges commissioned during the Rebellion, who were provided with juries, upright, intelligent, and selected by a marshal appointed by the President. The government had no right to conclude that Milligan, if guilty, would not receive in that court merited punishment; for its records disclose that it was constantly engaged in the trial of similar offences, and was never interrupted in its administration of criminal justice. If it was dangerous, in the distracted condition of affairs, to leave Milligan unrestrained of his liberty, because he “ conspired against the government, afforded aid and comfort to rebels, and incited the people to insurrection,” the law said arrest him, confine him closely, render him powerless to do further mischief; and then present his case to the grand jury of the district, with proofs of his guilt, and, if indicted, try him according to the course of the common law. If this had been done, the Constitution would have been vindicated, the law of 1863 enforced, and the securities for personal liberty preserved and defended.
Another guarantee of freedom was broken when Milligan was denied a trial by jury. ' The great minds of the country *123 Rave differed on the correct interpretation to be given to various provisions of tbe Eederal Constitution; and judicial decision bas been often invoked to settle tbeir true meaning; but until recently no one ever doubted that tbe right of trial by jury was fortified in tbe organic law against tbe power of attack. It is noio assailed; but if ideas can be expressed in words, and language bas any meaning, this right — one of tbe most valuable in a free country — is preserved to every one accused of crime wbo is not attached to tbe army, or navy, or militia in actual service. Tbe sixth amendment affirms that “ in all criminal prosecutions tbe accused shall enjoy tbe right to a speedy and public trial by an impartial jury,” language broad enough to embrace all persons and cases; but tbe fifth, recognizing tbe necessity of an indictment, or presentment, before any one can be held to answer for high crimes, “ excepts cases arising in tbe land or naval forces, or in tbe militia, when in actual service, in time of war or public danger;” and tbe framers of tbe Constitution, doubtless, meant to limit tbe right of trial by jury, in tbe sixth amendment, to those persons wbo were subject to indictment or presentment in tbe fifth.
Tbe discipline necessary to tbe efficiency of tbe army and navy, required other and swifter modes of trial than are furnished by tbe common law courts; and, in pursuance of tbe power conferred by the Constitution, Congress bas declared tbe kinds of trial, and tbe manner in which they shall be conducted, for offences committed while tbe party is in tbe military or naval service. Every one connected with these branches of tbe public service is amenable to tbe jurisdiction which Congress bas created for their government, and, while thus serving, surrenders bis right to be tried by tbe civil courts. All other persons, citizens of states whore tbe courts are open, if charged with crime, are guaranteed tbe inestimable privilege of trial by jury. This privilege is a vital principle, underlying the whole administration of criminal justice; it is not held by sufferance, and cannot be frittered away on any plea of state or political necessity. "When peace prevails, and the authority of tbe government is un *124 disputed, there is no difficulty of preserving the safeguards of liberty; for the ordinary modes of trial are never neglected, and no one wishes it otherwise; but if society is disturbed by civil commotion — if the passions of men are aroused and the restraints of law weakened, if not disregarded — these safeguards need, and should receive, the watchful care of those intrusted with the guardianship of the Constitution and laws. In no other Avay can we transmit to posterity unimpaired the blessings of liberty, consecrated by the sacrifices of the Revolution.
It is claimed that martial law covers with its broad mantle the proceedings of this military commission. The proposition is this: that in a time of war the commander of an armed force (if in bis opinion the exigencies of the country demand it, and of which he is to judge), has the power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to the rule of his will; and in the exercise of his lawful authority cannot be restrained, except by his superior officer or the President of the United States.
If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits, on the plea of necessity, with the approval of the Executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules.
The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law, established on such a basis, destroys every guarantee of the Constitution, and effectually renders the “ military independent of and superior to the civil power ” — the attempt to do which by the Ring of Great Britain was deemed by. our fathers such an offence, that they assigned it to the world as one of the causes which impelled them to declare their independence. Civil liberty and this kind of martial law cannot en *125 dure together; the antagonism is irreconcilable; and, in the conflict, one or the other must perish.
This nation, as experience has proved, cannot always remain at peace, and has no right to expect that it will always have wise and humane rulers, sincerely attached to the principles of the Constitution. Wicked men, ambitious of power, with hatred of liberty and contempt of law, may fill the place once occupied by Washington and Lincoln; and if this right is conceded, and the calamities of war again befall us, the dangers to human liberty are frightful to contemplate. If our fathers had failed to provide for just such a contingency, they would have been false to the trust reposed in them. They knew — the history of the world told them — the nation they were founding, be its existence short or long, would be involved in war; how often or how long continued, human foresight could not tell; and that unlimited power, wherever lodged at such a time, was especially hazardous to freemen. Eor this, and other equally weighty reasons, they secured the inheritance they had fought to maintain, by incorporating in a written constitution the safeguards which time had proved were essential to its preservation. Hot one of these safeguards can the President, or Congress, or the Judiciary disturb, except the one concerning the writ of habeas corpus.
It is essential to the safety of every government that, in a great crisis, like the one we have just passed through, there should be a power somewhere of suspending the writ of habeas corpus. In every war, there are men of previously good character, wicked enough to counsel their fellow-citizens to resist the measures deemed necessary by a good government to sustain its just authority and overthrow its enemies; and their influence may lead to dangerous combinations. In the emergency of the times, an immediate public investigation according to law may not be possible; and yet, the .peril to the country may be too imminent to suffer such persons to go at large. Unquestionably, there is then an exigency which demands that the government, if it should see fit in the exercise of a proper discretion to make arrests, should not be required to produce the persons ar *126 rested in answer to a writ of habeas corpus. The Constitution goes no further. It does not say after a writ of habeas corpus is denied a citizen, that he shall be tried otherwise than by the course of the common law; if it had intended this result, it was easy by the use of direct words to have accomplished it. The illustrious men who framed that instrument were guarding the foundations of civil liberty against the abuses of unlimited power; they were full of wisdom, and the lessons of history informed them that a trial by an established court, assisted by an impartial jury, was the only sure way of protecting .the citizen against oppression and wrong. Knowing this, they limited the suspension to one great right, and left the rest to remain forever inviolable. But, it is insisted that the safety of the country in time of war demands that this broad claim for martial law shall be sustained. If this were true, it could be well said that a country, preserved at the sacrifice of all the cardinal principles of liberty, is not worth the cost of preservation. Happily, it is not so.
It will be borne in mind that this is not a question of the power to proclaim martial law, when war exists in a community and the courts and civil authorities are overthrown. Nor is it a question what rule a military commander, at the head of his army, can impose on states in rebellion to cripple their resources and quell the insurrection. The jurisdiction claimed is much more extensive. The necessities of the service, during the late Kebellion, required that the loyal states should be placed within the limits of certain military districts and commanders appointed in them; and, it is urged, that this, in a military sense, constituted them the theatre of military operations; and, as in this case, Indiana had been and was again threatened with invasion by the enemy, the occasion was furnished to establish martial law.' The conclusion does not follow from the premises. If armies were collected in Indiana, they were to be employed in another locality, where the laws were obstructed and the national authority disputed. On her soil there was no hostile foot; if once invaded, that invasion was at an end, and with *127 it all pretext for martial law. Martial law cannot arise from a threatened invasion. Tire necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration.
It is difficult to see how the safety of the country required martial law in Indiana. If any of her citizens were plotting treason, the power of arrest could secure them, until the government was prepared for their trial, when the courts were open and ready to try them. It was as easy to protect witnesses before a civil as a military tribunal; and as there could be no wish to convict, except on sufficient legal evidence, surely an ordained and established court was better able to judge of this than a military tribunal composed of gentlemen not trained to the profession of the law.
It follows, from what has been said on this subject, that there are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, then, on the theatre of active military operations, wheye war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration; for, if this government is continued after the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open, and in the proper and tin obstructed exercise of their jurisdiction. It is also confined to the locality of actual war. Because, during the late Rebellion it could have been enforced in Virginia, where the national authority was overturned and the courts driven out, it does not follow that it should obtain in Indiana, where that authority was never disputed, and justice was always administered. And so in the case of a foreign invasion, martial rule may become a necessity in one state, when, in another, it would be “ mere lawless violence.”
*128 We are not without precedents in English and American history illustrating our views of this question; but it is hardly necessary to mate particular reference to them.
From the first year of the reign of Edward the Third, when the Parliament of England reversed the attainder of the Earl of Lancaster, because he could have been tried by the courts of the realm, and declared, “ that in time of peace no man ought to be adjudged to death for treason or any other offence without being arraigned and held tq answer; and that regularly when the king’s courts are open it is a time of peace in judgment of law,” down to the present day, martial law, as claimed in this case, has been condemned by all respectable English jurists as contrary to the fundamental laws of the land, and subversive of the liberty of the subject.
During the present century, an instructive debate on this question occurred in Parliament, occasioned by the trial and conviction by court-martial, at Demerara, of the Rev. John Smith, a missionary to the negroes, on the alleged ground of aiding and abetting a formidable rebellion in that colony. Those eminent statesmen, Lord Brougham and Sir James Mackintosh, participated in that debate; and denounced the trial as illegal; because it did not appear that the courts of law in Demerara could not try offences, and that “when the laws can act, every other mode of punishing supposed crimes is itself an enormous crime.”
So sensitive were our Bevolutionary fathers on this subject, although Boston was almost in a state of siege, when General Gage issued his proclamation of martial law, they spoke of it as an “ attempt to supersede the course of the common law, and instead thereof to publish and order the use of martial law.” The Virginia Assembly, also, denounced a similar measure on the part of Governor Dun-more “as an assumed power, which the king himself cannot exercise; because it annuls the law of the land and introduces the most execrable of all systems, martial law.”
In some parts of the country, during the war of 1812, our officers made arbitrary arrests and, by military tribunals, tried citizens who were not in the military service. These arrests *129 and trials, when brought to the notice of the courts, were uniformly condemned as illegal. The cases of Smith v. Shaw and McConnell v. Hampden (reported in 12 Johnson*), are illustrations, which we cite, not only for the principles ‘they determine, but on account of the distinguished jurists concerned in the decisions, one of whom for many years occupied a seat on this bench.
It is contended, that Luther v. Borden, decided by this court, is an authority for the claim of martial law advanced in this case. The decision is misapprehended. That case grew out of the attempt in Rhode Island to supersede the old colonial government by a revolutionary proceeding. Rhode Island, until that period, had no other form of local government than the charter granted by King Charles II, in 1668; and as that limited the right of suffrage, and did not provide for its own amendment, many citizens became dissatisfied, because the legislature would not afford the relief in their power; and without the authority of law, formed a new and independent constitution, and proceeded to assert its authority by force of arms. The old government resisted this; and as the rebellion was formidable, called out the militia to subdue it, and passed an act declaring martial law. Borden, in the military service of the old government, broke open the house of Luther, who supported the new, in order to arrest him. Luther brought suit against Borden; and the question was, whether, under the constitution and laws of the state, Borden was justified. This court held that a state “may use its military power to put down an armed insur-. rection too strong to be controlled by the civil authority;” and, if the legislature of Rhode Island thought the peril so great as to require the use of its military forces and the declaration of martial law, there was no ground on which this court could question its authority; and as Borden acted under military orders of the charter government, which had been recognized by the political power of the country, and was upheld by the state judiciary, he was justified in breaking *130 into and entering Luther’s house. This is the extent of the decision. There was no question in issue about the power of declaring martial law under the Federal Constitution, and the court did not consider it necessary even to inquire “to what extent nor under what circumstances that power may by exercised by a state.”
We do not deem it important to examine further the adjudged cases; and shall, therefore, conclude without any additional reference to authorities.
To the third question, then, on which the judges below were opposed in opinion, an answer in the negative must be returned.
It is proper to say, although Milligan’s trial and conviction by a military commission was illegal, yet, if guilty of the crimes imputed to him, and his guilt had been ascertained by an established court and impartial jury, he deserved severe punishment. Open resistance to the measures deemed necessary to subdue a great rebellion, by those who enjoy the protection of government, and have not the excuse even of prejudice of section to plead in their favor, is wicked; but that resistance becomes an enormous crime when it assumes the form of a secret political organization, armed to oppose the laws, and seeks by stealthy means to introduce the ene-' mies of the country into peaceful communities, there to light the torch of civil war, and thus overthrow the power of the United States. Conspiracies like these, at such a juncture, are extremely perilous; and those concerned in them are dangerous enemies to their country, and should receive the heaviest penalties of the law, as an example to deter others from similar criminal conduct. It is said the severity of the laws caused them; but Congress was obliged to enact severe laws to meet the crisis; and as our highest civil duty is to serve our country when in danger, the late war has proved that rigorous laws, when necessary, will be cheerfully obeyed by a patriotic people, struggling to preserve the rich blessings of a free government.
The two remaining questions in this case must be answered in the affirmative. The suspension of the privilege of the *131 writ of habeas corpus does not suspend the.writ itself. The writ issues as a matter of course; and on the return made to it the court decides whether the party applying is denied the right of proceeding any further with it.
If the military trial of Milligan was contrary to law, then he was entitled, on the facts stated in his petition, to he discharged from custody by the terms of the act of Congress of March 3d, 1863. The provisions of this law having been considered in a previous part of this opinion, we will not restate the views there presented. Milligan avers he was a citizen of Indiana, not in the military or naval service, and was detained in close confinement, by order of the President, from the 5th day of October, 1864, until the 2d day of January, 1865, when the Circuit Court for the District of Indiana, with a grand jury, convened in session at Indianapolis; and afterwards, on the 27th day of the same month, adjourned without finding an indictment or presentment against him. If these averments were true (and their truth is conceded for the purposes of this case), the court was required to liberate him on taking certain oaths prescribed by the law, and entering into recognizance for his good behavior.
But it is insisted that Milligan was a prisoner of war, and, therefore, excluded from the privileges of the statute. It is not easy to see how he can be treated as a prisoner of war, when he lived in Indiana for the past twenty years, was arrested there, and had not been, during the late troubles, a resident of any of the states in rebellion. If in Indiana he conspired with bad men to assist the enemy, he is punishable for it in the courts of Indiana; but, when tried for the offence, he cannot plead the rights of war; for he was not engaged in legal acts of hostility against the government, and only such persons, when captured, are prisoners of war. If he cannot enjoy the immunities attaching to the character of a prisoner of war, how can he be subject to their pains and penalties?
This case, as well as the kindred cases of Bowles and Horsey, were disposed of at the last term, and the proper orders were entered of record. There is, therefore, no additional entry required.
*132 The CHIEF JUSTICE
delivered the following opinion.
Four members of the court, concurring with their brethren in the order heretofore made in this cause, but unable to concur in some important particulars with the opinion which has just been read, think it their duty to make a separate statement of their views of the whole case.
"We do not doubt that the Circuit Court for the District of Indiana had jurisdiction of the petition of Milligan for the writ of habeas corpus.
Whether this court has jurisdiction upon the certificate of division admits of more question. The construction of the act authorizing such certificates, which has hitherto prevailed here, denies jurisdiction in cases where the certificate brings up the whole cause before the court. But none of the adjudicated cases are exactly in point, and we are willing to resolve whatever doubt may exist in favor of the earliest possible answers to questions involving life and liberty. We agree, therefore, that this court may properly answer questions certified in such a ease as that before us.
The crimes with which Milligan ivas charged were of the gravest character, and the petition and exhibits in the record, which must here be taken as true, admit his guilt. But whatever his desert of punishment may be, it is more important to the country and to every citizen that he should not be punished under an illegal sentence, sanctioned by this court of last resort, than that he should be punished at all. The laws which protect the liberties of the whole people must not be violated or set aside in order to inflict, even upon the guilty, unauthorized though merited justice.
The trial and sentence of Milligan were by military commission convened in Indiana during the fall of 1864. The action of the commission had been under consideration by President Lincoln for some time, when he himself became the victim of an abhorred conspiracy. It was approved by his successor in May, 1865, and the sentence was ordered to be carried into execution. The proceedings, therefore, had the fullest sanction of the executive department of the government.
*133 This sanction requires the most respectful and the most careful consideration of this court. The sentence which it supports must not be set aside except upon the clearest conviction that it cannot be reconciled with the Constitution and the constitutional legislation of Congress.
"We must inquire, then, what constitutional or statutory-provisions have relation to this military proceeding.
The act of Congress of March 3d, 1863, comprises all the legislation which seems to require consideration in this connection. The constitutionality of this act has not been questioned and is not doubted. ■ •
The first section authorized the suspension, during the Rebellion, of the writ of habeas corpus throughout the United States by the President. The two next sections limited this authority in important respects.
The second section required that lists of all persons, being citizens of states in which the administration of the laws had continued unimpaired in the Federal courts, who were then held or might thereafter be held as prisoners of the United States, under the authority of the President, otherwise than as prisoners of war, should be furnished to the judges of the Circuit and District Courts. The lists transmitted to the judges were'to contain the names of all persons, residing within their respective jurisdictions, charged with violation of national law. And it was required, in cases where the grand jury in attendance upon any of these courts should terminate its session without proceeding by indictment or otherwise against any prisoner named in the list, that the judge of the court should forthwith make an order that such prisoner desiring a discharge, should be brought before him or the court to be discharged, on entering into recognizance, if required, to keep the peace and for good behavior, or to appear, as the court might direct, to be further dealt with according to law. Every officer of the United States having custody of such prisoners was required to obey and execute the judge’s order, under penalty, for refusal or delay, of fine and imprisonment.
The third section provided, in case lists of persons other *134 than prisoners of war then held in confinement, or thereafter arrested, should not he furnished within twenty days after the passage of the act, or, in cases of subsequent arrest, within twenty days after the time of arrest, that any citizen, after the termination of a session of the grand jury without indictment or presentment, might, by petition alleging the facts and verified by oath, obtain the judge’s order of discharge in favor of any person so imprisoned, on the terms and conditions prescribed in the second section.
It was made the duty of the District Attorney of the United States to attend examinations on petitions for discharge.
It was under this act that Milligan petitioned the Circuit Court for the District of Indiana for discharge from imprisonment.
The holding- of the Circuit and District Courts of the United States in Indiana had been uninterrupted. The administration of the laws in the .Federal courts had remained unimpaired. Milligan was imprisoned under the authority of the President, and was not a prisoner of war. Uo list of prisoners had been furnished to the judges, either of the District or Circuit Courts, as required by the law. A grand jury had attended the Circuit Courts of the Indiana district, while Milligan was there imprisoned, and had.closed its session without finding any indictment or presentment or otherwise proceeding against the prisoner.
His case was thus brought within the precise letter and intent of the act of Congress, unless it can be said that Mil-ligan was not imprisoned by authority of the President; and nothing of this sort was claimed in argument on the part of the government.
It is clear upon this statement that the Circuit Court was bound to hear Milligan’s petition for the writ of habeas corpus, called in the act an order to bring the prisoner before the j udge or the court, and to issue the writ, or, in the language of the act, to make the order.
The first question, therefore — Ought the writ to issue? — ■ must be answered in the affirmative.
*135 And it is equally clear that he was entitled to the discharge prayed for.
It must he borne in mind that the prayer of the petition was not for an absolute discharge, but to be delivered from military custody and imprisonment, and if found probably guilty of any offence, to be turned over to the proper tribunal for inquiry and punishment; or, if not found thus probably guilty, to be discharged altogether.
And the express terms of the act of Congress required this action of the court. The prisoner must be discharged on giving such recognizance as the court should require, not only for good behavior, but for appearance, as directed by the court, to answer and be'further dealt with according to law.
The first section of the act authorized the suspension of the writ of habeas corpus generally throughout the United States. The second and third sections limited this suspension, in certain cases, within states where the administration of justice by the Federal courts remained unimpaired. In these cases the writ was still to issue, and under it the prisoner was entitled to his discharge by a circuit or district judge or court, unless held to bail for appearance to answer charges. FTo other judge or court could make an order of discharge under the writ. Except under the circumstances pointed out by the act, neither circuit nor district judge or court could make such an order. But under those circumstances the writ must be issued, and the relief from imprisonment directed by the act must be afforded. The commands of the act were positive, and left no discretion to court or judge.
An affirmative answer must, therefore, be given to the second question, namely: Ought Milligan to be discharged according to the prayer of the petition ?
That the third question, namely: Had the military commission in Indiana, under the facts stated, jurisdiction to try and sentence Milligan? must be answered negatively is an unavoidable inference from affirmative answers to the other two.
*136 The military commission could not have jurisdiction to try and sentence Milligan, if he could not be detained in prison under .his original arrest or under sentence, after the close of a session of the grand jury without indictment or other proceeding against him.
Indeed, the act seems to have been framed on purpose to secure the trial of all offences of citizens by civil tribunals, in states where these tribunals were not interrupted in the regular exercise of their functions.
Under it, in such states, the privilege of the writ might be suspended. Any person regarded as dangerous to the public safety might be arrested and detained until after the session of a grand jury. Until after such session no person arrested could have the benefit of the writ; and even then no such person could be discharged except on such terms, as to future appearance, as the court might impose. These provisions obviously contemplate no other trial or sentence than that of a civil court, and we could not assert the legality of a trial and sentence by a military commission, under the circumstances specified in the act and described in the petition, without disregarding the plain directions of Congress.
We agree, therefore, that the first two questions certified must receive affirmative answers, and the last a negative. We do not doubt that the positive provisions of the act of Congress require such answers. We do not think it necessary to look beyond these provisions. In them we find sufficient and controlling reasons for our conclusions.
But the opinion which has just been read goes further; and as we understand it, asserts not only that the military commission held in Indiana was not authorized by Congress, but that it was not in the power of Congress to authorize it; from which it may be thought to follow, that Congress has no power to indemnify the officers who composed the commission ‘against liability in civil courts for acting as members of it.
We cannot agree to this.
We agree in the proposition that no department of the *137 government of the United States — neither President, nor Congress, nor the Courts — possesses any power not given by the Constitution.
We assent, fully, to all that is said, in the opinion, of the inestimable value of the trial by jury, and of the other constitutional safeguards of civil liberty. And Ave concur, also, in what is said of the writ of habeas corpus, and of its suspension, with two reservations: (1.) That, in our judgment, when the writ is suspended, the Executive is authorized to arrest as well as to detain; and (2.) that there arc cases in which, the privilege of the writ being suspended, trial and punishment by military commission, in states where civil courts are open, may be authorized by Congress, as well as arrest and detention.
We think that Congress had power, though not exercised, to authorize the military commission which was held in Indiana.
We do not think it necessary to discuss at large the grounds of our conclusions. We will briefly indicate some of them.
The Constitution itself provides for military government as well as for civil government. And we do not understand it to be claimed that the civil safeguards of the Constitution have application in cases within the proper sphere of the former.
What, then, is that proper sphere? Congress has power to raise and support armies; to provide and maintain a navy; to make rules for the government and regulation of the land and naval forces; and to provide for governing such part of the militia as may be in the service of the United States.
It is not denied that the power to make rules for the government of the army and navy is a power to provide for trial and punishment by military courts without a jury. It has been so understood and exercised from the adoption of the Constitution to the present time.
Uor, in our judgment, does the fifth, or any other amendment, abridge that power. “ Cases arising in the land and naval forces, or in the militia in actual service in time of war *138 or public danger,” are expressly excepted from the fifth amendment, “that no person shall be held to answer for a capital or otherwise infamous-crime, unless on a presentment or indictment of a'grand jury,” and it is admitted that the exception applies to the other amendments as well as to the fifth.
Now, we understand this exception to have the same import and effect as if the powers of Congress in relation to the government of the army and navy and the militia had been recited in the amendment, and cases within those powers had been expressly excepted from its operation. The states, most jealous of encroachments upon the liberties of the citizen, when proposing additional safeguards in the form of amendments, excluded specifically from their effect cases arising in the government of the land and naval forces. Thus Massachusetts proposed that “ no person shall be tried for any crime by which he would incur an infamous punishment or loss of life until he be first indicted by a grand jury, except in such cases as may arise in the government and regulation of the land forces.” The exception in similar amendments, proposed by Yew York, Maryland, and Virginia, was in the same or equivalent terms. The amendments proposed by the states were considered by the first Congress, and such as were approved in substance were put in form, and proposed by that body to the states. Among those thus proposed, and subsequently ratified, was that which now stands as the fifth amendment of the Constitution. Ye cannot doubt that this amendment was intended to have the same force and effect as the amendment proposed by the states. We cannot agree to a construction which will impose on the exception in the fifth amendment a sense other than that obviously indicated by action of the state conventions.
We think, therefore, that the power of Congress, ifi the government of the land and naval forces and of the militia, is not at all affected by the fifth or any other amendment. It is not necessary to attempt any precise definition of the boundaries of this power. But may it not be said that gov *139 ernment includes protection and defence as well as the regulation of internal administration ? And is it impossible to imagine cases in which citizens conspiring or attempting the destruction or great injury of the national forces may be subjected by Congress to military trial and punishment in the just exercise of this undoubted constitutional power? Congress is but the agent of the nation, and does not the security of individuals against the abuse of this, as of every other power, depend on the intelligence and virtue of the people, on their zeal for public and private liberty, upon official responsibility secured by law, and upon the frequency of elections, rather than upon doubtful constructions of legislative powers ?
But we do not put our opinion, that Congress might authorize such a military commission as was held in Indiana, upon the power to provide for the government of the national forces.
Congress has the power not only to raise and support and govern armies but to declare war. It has, therefore, the power to provide by law for carrying on war. This power necessarily extends to all legislation essential to the prosecution of war with vigor and success, except such as interferes with the command of the forces and the conduct of campaigns. That power and duty belong to the President as commander-in-chief. Both these powers are derived from the Constitution, but neither is defined by that instrument. Their extent must be determined by their nature, and by the principles of our institutions.
The power to make the necessary laws is in Congress; the power to execute in the President. Both powers imply many subordinate and auxiliary powers. Each includes all authorities essential to its due exercise. But neither can the President, in war more than in peace, intrude upon the proper authority of Congress, nor Congress upon the proper authority of the President. Both are servants of the people, whose will is expressed in the fundamental law. Congress cannot direct the conduct of campaigns, nor can the Presi *140 dent, or any commander under him, without the sanction of Congress, institute tribunals for the trial and punishment of offences, either of soldiers or civilians, unless in cases of a controlling necessity, which justifies what it compels, or at least insures acts of indemnity from the justice of the legislature.
We by no means assert that Congress can establish and apply the laws of war where no war has been declared or exists.
Where peace exists the laws of peace must prevail. What we do maintain is, that when the nation is involved in war, and some portions of the country are invaded, and all are exposed to invasion, it is within the power of Congress to determine in what states or districts such great and imminent public danger exists as justifies the authorization of military tribunals for the trial of crimes and offences against the discipline or security of the army or against the public safety.
In Indiana, for example, at the time of the arrest of Mil-ligan and his co-conspirators, it is established by the papers in the record, that the state was a military district, was the theatre of military operations, had been actually invaded, and was constantly threatened with invasion. It appears, also, that a powerful secret association, composed of citizens and others, existed within the state, under military organization, conspiring against the draft, and plotting insurrection, the liberation of the prisoners of war at various depots, the seizure of the state and national arsenals, armed cooperation with the enemy, and war against the national government.
We cannot doubt that, in such a time of public danger, Congress had power, under the Constitution, to provide for the organization of a military commission, and for trial by that commission of persons engaged in this conspiracy. The fact that the Federal courts were open was regarded by Congress as a sufficient reason for not exercising the power; but that fact could not deprive Congress of the right to exercise it. Those courts might be open and undisturbed in the ex *141 ecution of tlieir functions, and yet wholly incompetent to avert threatened danger, or to punish, with adequate promptitude and certainty, the guilty conspirators.
In Indiana, the judges and officers of the courts were loyal to the government. But it might have been otherwise. In times (^f rebellion and civil war it may often happen, indeed, that judges and marshals will be in active sympathy with the rebels, and courts their most efficient allies.
We have confined ourselves to the question of power. It was for Congress to determine the question of expediency. And Congress did determine it. That body did not see fit to authorize trials by military commission in Indiana, but by the strongest implication prohibited them. With that prohibition we are satisfied, and should have remained silent if the answers to the questions certified had been put on that ground, without denial of the existence of a power which we believe to be constitutional and important to the public safety, — a denial which, as we have already suggested, seems to draw in question the power of Congress to protect from prosecution the members of military commissions who acted in obedience to their superior officers, and whose action, whether warranted by law or not, was approved by that upright and patriotic President under whose administration the Republic was rescued from threatened destruction.
We have thus far said little of martial law, nor do we propose to say much. What we have already said sufficiently indicates our opinion that there is no law for the government of the citizens, the armies or the navy of the United States, within American jurisdiction, which is not contained in or derived from the Constitution. And wherever our army or navy may go beyond our territorial limits, neither can go beyond the authority of the President' or the legislation of Congress.
There are under the Constitution three kinds of military jurisdiction: one to be exercised both in peace and war; another to be exercised in time of foreign war without the boundaries of'the United States, or in time of rebellion and civil war within states or districts occupied by rebels treated *142 as belligerents; and a third to be exercised in time of invasion or insurrection within the limits of the United States, or during rebellion within the limits of states maintaining adhesion to the National Government, when the public danger requires its exercise. The first of these may be called jurisdiction under MILITARY law, and is found in acts of Congress prescribing rules and articles of war, or otherwise providing for the government of the national forces; the second may be distinguished as MILITARY GOVERNMENT, superseding, as far as may be deemed expedient, the local law, and exercised by the military commander under the direction of the President, with the express or implied sanction of Congress; while the third may be denominated martial law PROPER, and is called into action by Congress, or temporarily, when the action of Congress cannot be invited, and in the case of justifying or excusing peril, by the President, in times of insurrection or invasion, or of civil or foreign war, within districts or localities where ordinary law no longer adequately secures public safety and private rights.
¥e think that the power of Congress, in such times and in such localities, to authorize trials for crimes against the security and safety of the national forces, may be derived from its constitutional authority to raise and support armies and to declare war, if not from its constitutional authority to provide for governing the national forces.
"We have no apprehension that this power, under our American system of government, in which all official authority is derived from the people, and exercised under direct responsibility to the people, is more likely to be abused than the power to regulate commerce, or the power to borrow money. And we are unwilling to give our assent by silence to expressions of opinion which seem to us calculated, though not intended, to cripple the constitutional powers of the government, and to augment the public dangers in times of invasion and rebellion.
Mr. Justice WAYNE, Mr. Justice SWAYNE, and Mr. Justice MILLER concur with me in these views.

 4 Cranch, 75.

 Page 193.

 6 Wheaton, 542.

 2 Peter's, 449.

 6 Wheaton, 264.

 14 Peters, 640.

 Pages 257 and 234.