## In re TERRITO.
### No. 11214.

Circuit Court of Appeals, Ninth Circuit.

June 8, 1946.

J. Edward Keating, Benjamin W. Henderson, and William B. Gilroy, all of Los Angeles, Cal., for appellant.

Charles H. Carr, U. S. Atty., and Mildred L. Kluckhohn, Asst. U. S. Atty., both of Los Angeles, Cal., for appellee.

Before STEPHENS, BONE and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

Gaetano Territo is being held by officers of the United States Army under the claim that he is a prisoner of war. Through the interposition of Frances Territo Di Maria, Territo petitioned the District Court to issue the writ of habeas corpus by which the restraining officer should be required to produce Territo in court and justify the restraint. It is alleged that the restraint is without legal support. We shall refer to Territo by name or as petitioner. The basis of the claimed illegal detention and restraint rests upon the allegation that petitioner was born in the United States and that at all times has been and is an American citizen.

The District Court issued an order to show cause why a writ of habeas corpus should not issue, and the restraining officer made his return and answer, setting out inter alia that Territo was captured in Italy upon the field of battle, and that he

was at the time of capture a soldier in the enemy Italian Army, and that he now holds him as a prisoner of war in the district over which the District Court for the District of Southern California has jurisdiction.

Thereafter, it was stipulated that the issues of the controversy, as revealed in the petition for the writ of habeas corpus, and the return and answer, should be tried at the hearing on the order to show cause without the issuance of the writ. The stipulation did not, in terms, provide that the allegations in the return and answer should be deemed denied, but the proceedings thereafter and in this court are based upon that premise.

Petitioner appeals from the judgment.

The court found, in brief:

I. Petitioner was born April 20, 1915, in West Virginia of Italian citizen parents, and resided there until about 1920, when his father took him to Italy, where he resided until September 5, 1943.

II. Until 1939, when his father told him he was born in the United States, he did not know where he had been born.

III. In 1936 petitioner served six months in the Italian Army and again in 1940, at which time he told army authorities he was born in the United States of America. (Petitioner claims this finding is incomplete; that he was impressed into the Italian Army, and that he informed army authorities he was an American citizen, but was afraid to press his claim.)

IV. Petitioner served in the Italian Army as private in army engineers corps, doing manual labor.

V. He was captured by the United States Army on July 23, 1943, at Cotrano, Sicily, while Italy and the United States were at war. When captured he was wearing part of the Italian Army uniform and attempting to escape on the field of battle by running with others away from the United States Army.

VI. Petitioner was held as a prisoner of war, then taken to Bizerte, then taken to the United States, arriving September 5, 1943, and is now held as prisoner of war by the United States Army authorities.

VII. Petitioner's presence in the United States has not constituted residence; that his permanent residence is in Italy where he resided with his wife and child. He so stated to American military authorities when captured. (Petitioner claims that the finding to the effect that his presence in the United States does not constitute residence is a conclusion rather than a finding of fact. He further claims that the evidence does not support the finding that he stated to American authorities that his permanent residence was in Italy.)

VIII. Upon arrival in the United States he told military authorities he was born in Welch, West Virginia, April 20, 1915.

IX. Since arrival in the United States he has been held as prisoner of war by American Army authorities, and at the time of filing the petition in habeas corpus he was at Wilmington, California.

X. That while being held at Camp Ross Figueroa at Wilmington, California, as a prisoner of war by American military authorities, petitioner voluntarily joined an Italian Service Unit; that said Italian Service Unit was made up of prisoners of war held in custody by American military authorities, who were allowed by them to work as laborers for eighty cents per day, and who were given additional privileges; that at all times during the time the petitioner was a member of the Italian Service Unit, he was being held as a prisoner of war by American military authorities for repatriation to Italy.

XI. That on August 1, 1945, a letter was directed to the Provost Marshal's Office in Washington, D. C., by J. Edward Keating, requesting release of petitioner upon the ground that he was born in the United States and was a citizen thereof; that on August 8, 1945, A. M. Tollefson, Col. CMP., Director Prisoner of War Operations Division, Provost Marshal General's Office, Washington, D. C., replied to said letter advising that petitioner would not be released on the ground only that he is being held as a prisoner of war by American military authorities for repatriation to Italy.

XII. That the true cause of petitioner's detention in the custody of respondent and

American military authorities is that petitioner was captured as a prisoner of war while serving in the Italian Army on the field of battle by the United States Army in Sicily, a part of Italy at a time when the United States and Italy were at war and in open conflict, on or about July 23, 1943; that thereafter, pursuant to the treaty of the United States with Italy, known as the Geneva Convention, relative to the treatment of prisoners of war, petitioner was for the convenience of the United States Government and to effectuate the purposes of said treaty, sent to the United States as part of the army program for the treatment of such prisoners, and because it was impracticable at the time to retain petitioner in custody as a prisoner of war within the physical confines of Italy; that he has been retained as a prisoner of war since July 23, 1943, up to and including the present time and is now being held as such prisoner of war; that petitioner has never been released by the United States military authorities from their custody as a prisoner of war.

(Petitioner rightly claims that a statement in X. is erroneous in that he enrolled in the Italian Service Unit at Fort Benning, Georgia, March 13, 1944.)

The court concluded:

I. That in conformity with Article I of the Geneva Convention by reference to the regulations annexed to the Hague Convention, Article III, a Treaty between the United States and Italy, petitioner was captured on the field of battle at a time when he was a member of the armed forces of a belligerent party, to-wit, Italy, and at a time when the United States and Italy were at war and in open conflict; and then and there was legally taken on July 23, 1943, a prisoner of war under the Geneva Convention by the United States Army, and the capture and retention of the petitioner by the military authorities of the United States was and is in accordance with the provisions of the said Geneva Convention.

II. That Italian Service Units are in no manner a part of the armed forces of the United States or any allied country; that they were organized as labor battalions for the purpose of allowing those prisoners of war so desiring an opportunity to work for pay and to obtain more privileges; that Italian Service Units are labor battalions formed under authority of the Geneva Convention and composed entirely of prisoners of war of Italy being held in the United States by American military authorities; that those prisoners of war voluntarily joining Italian Service Units do not cease to be prisoners of war.

III. That petitioner, upon voluntarily joining an Italian Service Unit, did not cease to be a prisoner of war and remained in the custody of the American Military authorities as a prisoner of war at all times since being captured on July 23, 1943; that petitioner has never been released by the American military authorities as a prisoner of war and at the present time is being held as a prisoner of war by American military authorities.

IV. That it is immaterial to the legality of petitioner's detention as a prisoner of war by American military authorities whether petitioner was a combatant or noncombatant member of the armed forces of the Italian army.

V. That it is immaterial to the legality of petitioner's detention as a prisoner of war by American military authorities whether petitioner is or is not a citizen of the United States of America.

VI. That under the Geneva Convention, petitioner's capture as a prisoner of war by American military authorities was valid and legal; that his detention by American military authorities and respondent herein has been and at all times is legal and valid as an Italian prisoner of war; that under the Geneva Convention, it is the obligation of the United States through the American military authorities to repatriate petitioner to Italy.

VII. That the Petition for a Writ of Habeas Corpus should be denied and the petition be dismissed.

Petitioner claims that conclusions of law II. and III. are not supported by the evidence, and that V. is erroneous in holding petitioner's claim to United States citizenship is immaterial as he makes no claim that he is entitled to be released unless he is, in fact, an American citizen. As to con-

clusion VI., petitioner claims the Geneva Convention was not intended to cover instances such as is here presented.

Petitioner claims on appeal, as he claimed in the district court, that he is and always has been an American citizen and because of that fact the circumstances of the case do not make him legally a prisoner of war. But for the claim of United States citizenship, petitioner does not question that he was taken a prisoner of war.

We have reviewed the authorities with care and we have found none supporting the contention of petitioner that citizenship in the country of either army in collision necessarily affects the status of one captured on the field of battle.

■ Those who have written texts upon the subject of prisoners of war agree that all persons who are active in opposing an army in war may be captured and except for spies and other non-uniformed plotters and actors for the enemy are prisoners of war. Hale Int.Law, 8th Ed., Ch. III, Ch. II, § 131; Winthrops Mil.Law & Precedents, 2nd Ed., Vol. 2, Pt. II, p. 1228; Oppenheims Int.Law, 6th Ed.Rev. (Lankertacht Ed.), Vol. II, Ch. IV, § 128, p. 300.

In Juragna Iron Co. v. United States, 212 U.S. 297, 29 S.Ct. 385, 388, 53 L.Ed. 520, the Supreme Court was treating of property belonging to an American company, which was destroyed in Cuba as a war measure in the Spanish-American war. In the course of its opinion, it is said that " * * * under the recognized rules governing the conduct of war between two nations, Cuba, being a part of Spain, was enemy's country and all persons, whatever their nationality, who resided there, were, pending such war, to be deemed enemies of the United States and of all its people."

■■ In Lamar's Executor v. Browne, 92 U.S. 187, 194, 23 L.Ed. 650, the court says: "In war, all residents of enemy country are enemies." Whiting's War Powers Under the Const. 340-342, says in part: "A neutral, or a citizen of the United States, domiciled in the enemy country, not only in respect to his property, but also as to his capacity to sue, is deemed as much an alien enemy as a person actually born under the allegiance and residing within the dominions of the hostile nation." Mr. Floury in his richly authenticated book "Prisoners of War" at page 30 refers to the fact that Irishmen, though then subjects of Great Britain, who had taken the oath of allegiance to the South African Republic during the Boer war, were treated as prisoners of war. See Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410; Sterling v. Constance, 287 U.S. 378, 53 S.Ct. 190, 77 L. Ed. 375.

While not directly in point, an expression in Ex Parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3, is indicative of the proper conclusion upon the point under consideration. We quote from pages 37-38 of 317 U.S., 63 S.Ct. 15: "Citizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war. Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of the Hague Convention and the law of war."

The obvious practical implication inherent in the question, as it seems to us, directs its solution. The object of capture is to prevent the captured individual from serving the enemy. He is disarmed and from then on he must be removed as completely as practicable from the front, treated humanely [1] and in time exchanged, repatriated [2] or otherwise released.

It is proper to note that petitioner was brought to this country under a war meas-

---

[1] See Floury, Prisoner of War, p. 15; Hall Int. Law, pp. 490–497; Oppenheim Int.Law, Vol. II, pp. 216–218; Rex v. Shiever, 97 Eng.Repts. 551. As to Prisoners of War, see Hyde Int.Law, § 675, p. 1859.

[2] International Law, Vol. 3, 2nd Rev. Ed. (Hyde), pp. 1858–1859: § 674. Repatriation. Repatriation may be described as the restoration of persons held in captivity to the State to which they belong. Repatriation accomplices release. The former is a natural if not an immediate consequence of the conclusion of peace. As quickly as possible thereafter the repatriation should be carried out. The treaty of peace commonly specifies the time. Prisoners may, how-

ure by orders of the military authorities as a prisoner of war and not in accord with nor under the immigration laws limiting and regulating entries of residents or nationals of another nation. His personal presence within the border of the United States, as is true of many thousands brought here as prisoners of war, is merely for his safe keeping under the restraint of the Army and arrangement with the immigration authorities and does not constitute residence.[3]

Petitioner argues that he was impressed against his will into the Italian Army, but the status of a volunteer or that of a draftee, as a prisoner of war who is captured upon the field of battle, is not different. There was no error in the district court's holding that Territo upon capture was properly held as a prisoner of war.

Petitioner advances the claim that conceding his status as a prisoner of war when captured, his status was no longer such after he joined the Italian Service Unit.

Prisoners of war are not allowed under the Geneva Convention to engage in war effort against the enemy country of which he was a soldier nor are they allowed to be impressed into involuntary labor. It is permitted, however, for prisoners of war to agree to do work and this is exactly what happened in this case. Petitioner volunteered to join the Unit and received pay for work performed. We do not believe that joining the Unit made him anytheless a prisoner of war.[4]

---

ever, be repatriated prior to the termination of the conflict.

The Geneva Convention of 1929 announces that "When belligerents conclude a convention of armistice, they must, in principle, have appear therein stipulations regarding the repatriation of prisoners of war"; that if it has not been possible to insert stipulations in this regard in such convention, the belligerents are, nevertheless, to come to an agreement as soon as possible; that in any case, repatriation is to be effected with the least possible delay after the conclusion of peace. The Geneva Convention makes wise provision for the direct repatriation and also the hospitalization in a neutral country of sick and wounded prisoners of war. Thus, belligerants are bound to send back to their own country, regardless of rank or number, seriously sick and seriously injured prisoners of war, after having brought them to a condition where they can be transported. Agreements between belligerents are to settle as soon as possible the cases of invalidity or of sickness, entailing direct repatriation, as well as those calling for hospitalization in a neutral country. Upon the outbreak of hostilities, belligerents are to come to an agreement to name mixed medical commissions who are to make examination of sick or wounded prisoners and all due decisions regarding them. The Convention also provides that throughout the duration of hostilities and for humane considerations, belligerents may conclude agreements with a view to the direct repatriation or hospitalization in a neutral country of able-bodied prisoners of war who have undergone a long period of captivity.

[3] As Mr. Justice Holmes said in Kaplan v. Tod, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585: "Moreover while she [a person interned in the immigration station at New York and later committed to a society for safe keeping pending decision] was at Ellis Island she was to be regarded as stopped at the boundary line [of the country] and kept there unless and until her right to enter should be declared. United States v. Ju Toy, 198 U.S. 253, 263, 25 S.Ct. 644, 49 L.Ed. 1040. When her prison bounds were enlarged by committing her to the custody of the Hebrew Society, the nature of her stay within the territory was not changed. She was still in theory of law at the boundary line and had gained no foothold in the United States. Nishimura Ekiu v. United States, 142 U.S. 651, 661, 12 S.Ct. 336, 35 L.Ed. 1146. She never has been dwelling in the United States within the meaning of the Act. Still more clearly she never has begun to reside permanently in the United States within the later Act of March 2, 1907, c. 2534, § 5, 34 Stat. 1229 [citing cases]." Cf. United States ex rel. Ling Yee Suey v. Spar, 2 Cir., 149 F.2d 881.

[4] "Place: Fort Benning, Ga.

Date: March 13, 1944.

Application for employment in Italian Service Units. By reason of the Armistice signed by the United Nations with the Government of Italy, and also because of the state of war now existing between Italy and Germany, I request, voluntarily, employment in the Italian Service Units.

I promise that I will work in behalf of the United States of America wheresoever required, in whatsoever military activity assigned me (except actual com-

We set out pertinent parts of Geneva Convention in the margin.[5]

It is true that Col. Patterson, Battalion Commander of the Italian Service Unit, Prisoner of War Battalion, testified in answer to procedure followed in the matter of assigning prisoners to the Service Unit as follows: "I have no direct knowledge but according to the information that I have they were processed and screened in a prisoner of war camp in the United States and those who declared their intention of serving the United States were permitted to change their status from a prisoner of war status to an Italian Service Unit status." It does not appear that Col. Patterson 'had knowledge or authority upon which to make such a conclusion and these proceedings show that those in authority do not take such view of service in the Unit. General Bryan, the Provost Marshal General of the Army, testified that petitioner was at the time of trial being held as a prisoner of war.

■ It is further argued that the cessation of hostilities between United States and Italy, an axis power, and the change of Italy from belligerency ,against the United States to that of active participation against another of the axis powers together

---

bat) and that I will aid the United States to the best of my ability in the progress of the struggle against the common enemy, Germany.

I promise not to abuse the faith and trust reposed in me by transgressing any of the conditions regulating the special privileges extended me, resulting from my promise.

A promise to obey all of the orders or regulations promulgated by the American military authorities and I understand that, should I not so do then my privileges will be withdrawn and I shall be subject to disciplinary action according to the Articles of War of the United States of America, which said Articles have been read to me.

(Subscribed) Gaetano Territo"

[5] "Section III. Labor of Prisoners of War.

"Chapter 1. Generalities.

"Article 27.

"Belligerents may utilize the labor of able prisoners of war, according to their rank and aptitude, officers and persons of equivalent status excepted. * * *"

"Chapter 2. Organization of the Labor."

Under this Chapter, Articles 28, 29 and 30 govern the labor for the account of private persons; that the work shall not be excessive and that there shall be rest periods during each week.

"Chapter 3. Prohibited Labor.

"Article 31.

"Labor furnished by prisoners of war shall have no direct relation with war operations. It is especially prohibited to use prisoners for manufacturing and transporting arms or munitions of any kind, or for transporting material intended for combatant units.

"In case of violation of the provisions of the preceding paragraph, prisoners, after executing or beginning to execute the order, shall be free to have their protests presented through the mediation of the agents whose functions are set forth in Articles 43 and 44, or, in the absence of an agent, through the mediation of representatives of the protecting Power."

"Chapter 4. Labor Detachments."

This Chapter is the authority for the organization and operation of Italian Service Units. Article 33 provides as follows:

"The system of labor detachments must be similar to that of prisoners-of-war camps, particularly with regard to sanitary conditions, food, attention in case of accident or sickness, correspondence and the receipt of packages.

"Every labor detachment shall be dependent on a prisoners' camp. The commander of this camp shall be responsible for the observation, in the labor detachment, of the provisions of the present Convention."

"Chapter 5. Wages."

This Chapter provides for the pay received by these members:

"Prisoners of war shall not receive wages for work connected with the administration, management and maintenance of the camps.

"Prisoners utilized for other work shall be entitled to wages to be fixed by agreements between the belligerents.

"These agreements shall also specify the part which the camp administration may retain, the amount which shall belong to the prisoner of war and the manner in which that amount shall be put at his disposal during the period of his captivity.

"While awaiting the conclusion of the said agreements, payment for labor of prisoners shall be settled according to the rules given below: * * *."

with the service units in some manner changes the status of petitioner. However, no treaty of peace has been negotiated with Italy and petitioner remains a prisoner of war. We hold, as did the District Court, that petitioner's restraint by the respondent is a legal one.

Affirmed.