HUDSON, District Judge,
dissenting:
I regret that I am unable to concur in the majority opinion, except to the extent that I agree that this Court has jurisdiction over this appeal. Although I do not embrace all aspects of the majority’s jurisdictional reasoning, I agree that Section 7 of the Military Commission Act of 2006(MCA) does not divest this Court of its constitutional jurisdiction, under Article *196 I, Section 9, to review habeas corpus decisions involving individual detainees within the United States. See Hamdi v. Rumsfeld, 542 U.S. 507, 525, 124 S.Ct. 2633, 2644, 159 L.Ed.2d 578 (2004). The MCA may, however, foreclose a right of statutory review. Beyond the jurisdictional question, the majority and I part company.
While I commend the majority on a thoroughly researched and impressively written opinion, I must conclude that their analysis flows from a faulty predicate. In my view, the appellant was properly designated as an enemy combatant by the President of the United States pursuant to the war powers vested in him by Articles I and II of the United States Constitution and by Congress under the Authorization to Use Military Force (AUMF). See Hamdi v. Rumsfeld, 296 F.3d 278, 281-82 (4th Cir.2002).[1] I am also of the opinion that al-Marri has received all due process entitlements prescribed by existing United States Supreme Court precedent. I would therefore vote to affirm the district court’s dismissal of al-Marri’s Petition for Writ of Habeas Corpus.
The wellspring of the majority’s reasoning is the notion that a non-military person arrested on U.S. soil, outside the zone of battle, for providing active aid to the enemy at time of war, cannot be declared an enemy combatant and detained for the duration of the hostilities, but must be prosecuted in the civilian courts of the United States. In fact, the majority would even go further and find that the language of the AUMF does not include organizations, such as al Qaeda, that are not affiliated with recognized nation states. The clear congressional intent underlying the AUMF was to afford the President of the United States all the powers necessary to suppress those individuals or organizations responsible for the terrorist attack on September 11, 2001. This broad language would certainly seem to embrace surreptitious al Qaeda agents operating within the continental United States. The AUMF provided as follows:
[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.
Pub.L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (emphasis added). History has proven that al Qaeda, an international terrorist organization with which the United *197 States is at war, falls squarely within that definition. See Hamdi v. Rumsfeld, 316 F.3d 450, 459 (4th Cir.2003), vacated and remanded on other grounds, Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004).
Central to the majority’s analysis is the locus of his arrest. Unlike the petitioners in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004), and Hamdan v. Rumsfeld, — U.S.-, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), al-Marri is a lawful resident alien who was not taken into custody in a battle zone. He was arrested in Peoria, Illinois, where he was residing on a student visa. Despite powerful evidence of his connection to al Qaeda, the majority believe the President is without power to declare him an enemy combatant. They believe he must be indicted and tried for crimes against the United States. Although definitive precedent is admittedly sparse, in my opinion, this position is unsupported by the weight of persuasive authority.
In Padilla v. Hanft, 423 F.3d 386 (4th Cir.2005), a panel of this Court unanimously rejected the argument that the locus of capture was relevant to the President’s authority to detain an enemy combatant. See id. at 394. Padilla, a U.S. citizen, was arrested by FBI agents upon his arrival at O’Hare International Airport in Chicago, Illinois. Id. at 388. A close associate of al Qaeda, Padilla had been “armed and present in a combat zone during armed conflict between al Qaeda/Taliban forces and the armed forces of the United States.” Id. at 390 (internal quotation marks omitted). Moreover, “Padilla met with Khalid Sheikh Mohammad, a senior al Qaeda operations planner, who directed Padilla to travel to the United States for the purpose of blowing up apartment buildings, in continued prosecution of al Qaeda’s war of terror against the United States.” Id.
This Court in Padilla reversed the holding of the district court that the President lacked authority under the AUMF to detain Padilla, and that Padilla must be either criminally prosecuted or released. Id. With respect to Padilla’s argument that the circumstances of his detention mandated only the option of criminal prosecution, this Court noted:
... We are convinced, in any event, that the availability of criminal process cannot be determinative of the power to detain, if for no other reason than that criminal prosecution may well not achieve the very purpose for which detention is authorized in the first place-the prevention of return to the field of battle. Equally important, in many instances criminal prosecution would impede the Executive in its efforts to gather intelligence from the detainee and to restrict the detainee’s communication with confederates so as to ensure that the detainee does not pose a continuing threat to national security even as he is confined-impediments that would render military detention not only an appropriate, but also the necessary, course of action to be taken in the interest of national security.
Id. at 394-95.
Military detention during time of war and criminal prosecution serve discrete functions. The object of criminal prosecution is to punish for legal transgression. The purpose of military detention is to immobilize the enemy during hostilities. Hamdi, 542 U.S. at 518, 124 S.Ct. at 2640. Such detention is also intended “to prevent the captured individual from serving the enemy.” In re Territo, 156 F.2d 142, 145 (9th Cir.1946).
The only significant fact that distinguishes the justification for Padilla’s detention from that of al-Marri is that Padilla at some previous point in time had been *198 armed and present in a combat zone. There was no indication, however, that Padilla was ever a soldier in a formal sense, particularly while acting on U.S. soil.
Like Padilla, al-Marri, an identified al Qaeda associate, was dispatched to the .United States by the September mastermind as a “sleeper agent” and to explore computer hacking methods to disrupt the United States’ financial system. Moreover, al-Marri volunteered for a martyr mission on behalf of al Qaeda, received funding from a known terrorist financier, and communicated with known terrorists by phone and e-mail. Decl. of Jeffrey N. Rapp, Director, Joint Intelligence Task Force for Combating Terrorism, ¶ 7, Sept. 9, 2004. It is also interesting to note that al-Marri arrived in the United States on September 10, 2001. Id.
The district court in this case credited the Declaration of Rapp, which was unre-butted, and found by a preponderance of the evidence, that al-Marri had been properly classified and detained as an enemy combatant. See Al-Marri v. Wright, 443 F.Supp.2d 774, 784 (D.S.C.2006).[2]
The standard employed by the district court to determine al-Marri’s qualifications for enemy combatant status was analogous to that invoked by the United States Supreme Court in Ex Parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942). In Qui-rin, the Court explained,
[E]ntry upon our territory in time of war by enemy belligerents, including those acting under the direction of the armed forces of the enemy for the purpose of destroying property used or useful in prosecuting the war, is a hostile and war-like act....
... Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of ... the law of war....
Id. at 36-38, 63 S.Ct. 2. The Quirin Court further provided that “[i]t is without significance that petitioners were not alleged to have borne conventional weapons or that their proposed hostile acts did not necessarily contemplate collision with the Armed Forces of the United States.” Id. at 37, 63 S.Ct. 2. “Nor are petitioners any the less belligerents if, as they argue, they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations.” Id. at 38, 63 S.Ct. 2.
Ex parte Milligan, 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281 (1866), does not undermine the district court’s decision. Milligan did not associate himself with a rebellious State with which the United States was at war. See Milligan, 71 U.S. at 131; Quirin, 317 U.S. at 45, 63 S.Ct. at 19 (noting that the Court in Milligan “concluded that Milligan [was] not ... a part of or associated with the armed forces of the enemy”). In this case, the unrebutted evidence shows that al-Marri associated himself with and became an agent of al Qaeda, the organization targeted by the AUMF and the enemy with which the United States is at war. See Rapp Decl. ¶ 7 (“Al-Marri is an al Qaeda ‘sleeper agent’ ... was trained at an al Qaeda terror camp ... met personally with Usama Bin Laden ... and volunteered for a martyr mission.”).[3] As *199 noted above, it is without significance that al Marri did not himself carry a conventional weapon in a zone of active military operations. See Quirin, 317 U.S. at 37-38, 63 S.Ct. 2.
In Hamdi, the Supreme Court considered the due process requirements for a citizen being held in the United States as an enemy combatant. See Hamdi, 542 U.S. at 509, 124 S.Ct. at 2635. Hamdi was an American citizen captured in Afghanistan for allegedly taking up arms with the Taliban in a combat zone. Id. at 510, 124 S.Ct. at 2635. Like al-Marri, Hamdi was being detained at the Naval Brig in Charleston, South Carolina. Id. at 510, 124 S.Ct. at 2636. After applying a balancing of interest calculus, the Court observed, “a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government’s factual assertions before a neutral deci-sionmaker.” Hamdi, 542 U.S. at 533, 124 S.Ct. at 2648. “It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.” Id. at 533, 124 S.Ct. at 2649 (internal quotation marks omitted).
After upholding the power of the President to detain al-Marri under the AUMF, the district court, after providing him with all due process entitlements articulated in Hamdi, found that his continued detention as an enemy combatant was proper and dismissed his petition. See Al-Marri, 443 F.Supp.2d at 785. In addition, al-Marri was represented by counsel at all stages of the proceedings below.
I believe the district court correctly concluded that the President had the authority to detain al-Marri as an enemy combatant or belligerent. Although al-Marri was not personally engaged in armed conflict with U.S. forces, he is the type of stealth warrior used by al Qaeda to perpetrate terrorist acts against the United States. Al-Marri’s detention is authorized under the AUMF “to prevent any future acts of international terrorism against the United States.” AUMF § 2(a). Furthermore, setting aside the amorphous distinction between an “enemy combatant” and an “enemy belligerent,” there is little doubt from the evidence that al-Marri was present in the United States to aid and further the hostile and subversive activities of the organization responsible for the terrorist attacks that occurred on September 11, 2001.
I therefore vote to affirm the district court.

. In Hamdi v. Rumsfeld, the U.S. Supreme Court found that the AUMF provided congressional authority for the President to detain Hamdi as an enemy combatant under the narrow facts of that case. The critical elements of the court's definition of an "enemy combatant”, for the purposes of that case, were the petitioner's being: (1) "part of a supporting force hostile to the United States or coalition partner”, and (2) "engaged in an armed conflict against the United States.” Hamdi, 542 U.S. at 526, 124 S.Ct. at 2645 (internal quotation marks omitted).
The boundaries of activity qualifying for "enemy combatant” status staked out in Hamdi were not meant to be immutable. The obvious impact of the limiting language was to confine the court's holding to the immediate facts before them.
While al-Marri was not captured while armed in a formal theater of war, the evidence would certainly support the conclusion that he was actively supporting forces hostile to the United States — and that the forces he was supporting were actively engaged in armed conflict against the United States.
Given the unconventional nature of the conflict that the United States is engaged in with al Qaeda, the exact definitions of "enemy combatants” and "enemy belligerents” are difficult to conceptualize and apply with precision.

. Al-Marri not only failed to offer any evidence on his behalf, he refused to even participate in the initial evidentiary process. Al-Mani, 443 F.Supp.2d at 785.

. Just as mere presence is not sufficient to make one a part of a criminal conspiracy or an accomplice to a crime, I agree with the majority that mere association with al Qaeda or an organization that supports al Qaeda *199 does not necessarily make one an enemy combatant. See Milligan, 71 U.S. at 131 (stating that "[i]f in Indiana [Milligan] conspired with bad men to assist the enemy, he is punishable for it in the courts of Indiana”). This is not a case, however, of mere association. Al-Marri trained with and became an agent of al Qaeda and, operating under its guidance and direction, entered the United States on September 10, 2001, "for the purpose of engaging in and facilitating terrorist activities subsequent to September 11,” the very activities that the AUMF was intended to prevent. Rapp Deck ¶ 7; see AUMF § 2(a).