WILLIAMS, Chief Judge,
concurring in part and dissenting in part:
While I respect the lengthy and thorough writings in this case, I believe that Aii Saleh Kahlah al-Marri’s 28 U.S.C.A. § 2241 (West 2006 & Supp.2007) petition presents a relatively straightforward factual situation.[1] According to the declaration filed in this case (and sworn under pain of perjury) by Jeffrey N. Rapp, the Director of the Joint Intelligence Task Force for Combating Terrorism (the “Rapp Declaration”), Al-Marri is a member of al-Qaeda who underwent training in Afghanistan between 1996 and 1998 and was sent to the United States as a sleeper agent on September 10, 2001.[2] Accepting these allegations as true, I believe, pursuant to the Authorization for Use of Military Force Joint Resolution, Pub.L. No. 107-40, 115 Stat. 224 (September 18, 2001) (“AUMF”), the President has the power to detain al-Marri. Thus, on this issue I agree with the separate opinions of Judge Trader, Judge Wilkinson, and Judge Niemeyer. Unlike Judge Trader, however, given al-Marri’s failure to “participate in a meaningful way,” (J.A. at 244), before the magistrate judge and district court, I would hold that al-Marri cannot now challenge the factual basis for his detention before our court. Accordingly, like Judge Wilkinson and Judge Niemeyer, I would affirm the dismissal of al-Marri’s § 2241 petition and therefore dissent from the judgment of the court.
I.
A.
Following the September 11 attacks, Congress, on September 18, 2001, enacted the AUMF, which authorized the President, acting as Commander-in-Chief, to “use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided” the terrorist attacks that occurred on September 11, 2001. 115 Stat. at 224. The purpose of such authorization, Congress made clear, was to “prevent any future acts of international terrorism against the United States by such nations, organizations, or persons.” Id.
In Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004), the Supreme Court held that the AUMF granted the President the power to detain “enemy combatants” — as the term was defined in that case-including a United States citizen captured overseas during the conflict in Afghanistan. Id. at 521, 124 S.Ct. 2633. As the Court explained, detention of an enemy combatant fell within the range of “necessary and appropriate force” granted by the AUMF because “detention to prevent a combatant’s return to the battlefield is a fundamental incident of *285 waging war.”[3] Id. at 519, 124 S.Ct. 2633; see also In re Territo, 156 F.2d 142, 145 (9th Cir.1946) (noting military detention serves “to prevent the captured individual from serving the enemy.”) Of equal import, however, is the Supreme Court’s holding that civilians may not be subject to military detention. Ex Parte Milligan, 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281 (1866). Thus, in my view, if al-Marri is an “enemy combatant” who falls within the scope of the AUMF, he may be detained; if, however, he is not an enemy combatant, and therefore a mere civilian, the Constitution forbids such detention.
In Hamdi, the Supreme Court defined the term “enemy combatant” for purposes of that case as “an individual who ... was part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there.” Hamdi 542 U.S. at 516, 124 S.Ct. 2633 (plurality) (internal quotation marks omitted). The Hamdi Court left it to lower courts to further refine the definition in future cases, see Hamdi 542 U.S. at 522 n. 1, 124 S.Ct. 2633 (“The permissible bounds of the [enemy combatant] category will be defined by the lower courts as subsequent cases are presented to them”).
In the context of World War II, the Court defined the term “unlawful combatant” to include:
those who during time of war pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction of life or property, have the status of unlawful combatants punishable as such by military commission.
Ex Parte Quirin, 317 U.S. 1, 35, 63 S.Ct. 2, 87 L.Ed. 3 (1942). The Court expounded later that “enemy belligerents” “inelud[ed] those acting under the direction of the armed forces of the enemy, for the purpose of destroying property used or useful in prosecuting the war.” Id. at 37, 63 S.Ct. 2.
A distillation of these precedents, I believe, yields a definition of an enemy combatant subject to detention pursuant to Congressional authorizations as an individual who meets two criteria: (1) he attempts or engages in belligerent acts against the United States, either domestically or in a foreign combat zone; (2) on behalf of an enemy force.
Given the specific allegations against al-Marri, I have little difficulty concluding that he satisfies the first criterion. First, the allegations set forth in the Rapp Declaration, if true, clearly show that al-Marri was on United States soil to commit acts of belligerency against the United States. See Quirin, 317 U.S. at 31, 63 S.Ct. 2 (stating that unlawful combatants include those who commit “hostile acts involving destruction of life or property” on United States soil).
According to the Rapp Declaration, al-Marri also meets what I view as the second requirement of an enemy combatant: that the belligerent acts be carried out on behalf of an enemy force. Unlike the plurality, I cannot accept al-Marri’s contention that because he allegedly has ties only to al Qaeda, a terrorist organization that does not control any nation, he does not meet this portion of the definition of enemy combatant.
*286 The plurality opinion may very well be correct that, under the traditional “law of war,” persons not affiliated with the military of a nation-state may not be considered enemy combatants. And I recognize the respect domestic courts have long afforded the “law of nations.” See Murray v. Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (“[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.”). Here, however, Congress has, through the AUMF, addressed precisely this question by clearly authorizing the President to use force against “organizations,” as well as against nation-states. See Padilla v. Hanft, 428 F.3d 386, 395-96 (4th Cir.2005) (noting “the AUMF constitutes ... a clear statement” in favor of detention). As a specific and targeted congressional directive, the AUMF controls the question of who may be detained, for purposes of domestic law — at least with respect to those individuals that fall within its scope.
The AUMF grants the President power to use force against “organizations” that he determines “planned, authorized, committed, or aided in” the September 11 attacks. Al Qaeda is obviously an “organization” that “planned, authorized, committed, or aided in” those attacks. Thus, in my view, the AUMF has labeled al Qaeda an enemy force.[4] See also Hamdi, 542 U.S. at 518, 124 S.Ct. 2633 (“There can be no doubt that individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for those attacks, are individuals Congress sought to target in passing the AUMF.”); Padilla, 423 F.3d at 389 (defining “al Qaeda” as “an entity with which the United States is at war”). In fact, al Qaeda provided the impetus for the enactment of the AUMF. Indeed, “read in light of its purpose clause ... and its preamble ..., the AUMF applies even more clearly and unmistakably to [al-Mar-ri] than to Hamdi.” Padilla, 423 F.3d at 396.
Certainly, the Constitution does not permit “a military trial ... for any offence whatever of a citizen in civil life, in nowise connected with the military service.” Milligan, 71 U.S. at 121-22, 71 U.S. 2. However, the result in Milligan followed because the petitioner Milligan was not “part of or associated with the armed forces of the enemy,” Quirin, 317 U.S. at 45, 63 S.Ct. 2, and I see nothing in the Constitution that prohibits the President, operating with the express consent of the Congress, from declaring an individual associated with an organization that has undertaken acts of war against the United States to be an enemy combatant. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (Jackson, J., concurring) (noting Presidential power is “at its maximum” when the President operates with Congressional authorization).
I wish to emphasize that by permitting the President to militarily detain al-Marri pursuant to the AUMF I am not being expansive; in al-Marri we are dealing with someone squarely within the purposes of the AUMF, which was passed to target organizations, like al Qaeda, responsible for the September 11 attacks and to prevent future terrorist attacks. This case does not present what to me are more *287 difficult issues regarding enemy combatants and the scope of AUMF, such as the status of an individual who joined al Qaeda after September 11, 2001, or an individual who is part of a designated foreign terrorist organization, see U.S. Dep’t of State, Office of the Coordinator for Counterter-rorism, Foreign Terrorist Organizations Fact Sheet 2008 (Apr. 8, 2008), http://www. state.gov/s/ct/rls/fs/08/103892.htm (last visited May 5, 2008), that played no role in the September 11 attacks. Instead, al-Marri is clearly an “individual[ ] Congress sought to target in passing the AUMF.” Hamdi 542 U.S. at 518, 124 S.Ct. 2633. In addition, while “indefinite detention” of enemy combatants is not permitted, see generally Hamdi 542 U.S. at 519-20, 124 S.Ct. 2633, we remain engaged against the forces of al Qaeda in the border regions of Afghanistan to this day.[5]
Moreover, it is important to note the breadth of al-Marri’s argument. According to al-Marri, were authorities to have detained one of the hijackers on September 11, box-cutter in hand, that hijacker could have been militarily detained in the immediacy of the situation, but thereafter would have had to be turned over to civilian courts.[6] This result would follow despite the fact that the hijacker would have been poised to commit an act of war — in fact an act of unlawful belligerency, see Quirin, 317 U.S. at 31, 63 S.Ct. 2 — against the United States. The result also seems in tension with the Court’s reminder in Quirin that:
By a long course of practical administrative construction by its military authorities, our Government has likewise recognized that those who during time of war pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction of life or property, have the status of unlawful combatants punishable as such by military commission.
Id. at 35, 63 S.Ct. 2.
B.
Notwithstanding the broad congressional authorization provided in the AUMF, al-Marri argues that Congress later circumscribed the President’s power of detention by passing the Patriot Act, Pub.L. 107-56, 115 Stat. 272 (2001) (entitled “Mandatory Detention of Suspect Terrorists; Habeas Corpus; Judicial Review”). The Patriot Act, passed shortly after the AUMF, provides, in relevant part, for the short term “[detention of [terrorist [alliens.” Patriot Act § 412(a). The power to detain is vested in the Attorney General, but the Act prohibits “indefinite detention.” Instead, it requires that “not later than 7 days after the commencement of such detention,” the Attorney General must either (1) begin “removal proceedings” or (2) “charge the alien with a criminal offense.” Id. § 412(a). The Patriot Act does permit an extension of “additional periods of up to six months” if removal is “unlikely for the reasonably foreseeable future” and the alien’s release “will threaten the national security of the United States or the safety of the community or any person.” Id.
Al-Marri argues that these more-specific provisions governing the scope of detentions govern the more-general authorization found in the AUMF. See Long Island *288 Care at Home, Ltd. v. Coke, — U.S.-, 127 S.Ct. 2339, 2348, 168 L.Ed.2d 54 (2007) (“[Normally the specific governs the general.”); Warren v. N.C. Dept. of Human Resources, 65 F.3d 385, 390 (4th Cir.1995) (same). Of course, this maxim is only true if the two provisions deal with the same subject matter. Here, I view section 412 of the Patriot Act to refer to the President’s power, under Article II § 3, to “take Care that the Laws be faithfully executed.” U.S. Const., art. II, § 3. The statute refers to the Attorney General, the President’s agent in implementing the Take Care Clause, and it is found nestled within the immigration code. Fairly read, the Patriot Act does not therefore purport to limit the President’s separate Commander-in-Chief power. See Article II, § 2, cl. 1 (“The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States.”). But the authorization granted in the AUMF, with its explicit reference to military force, relates to the Commander-in-Chief power. Whatever limitations are present in the Patriot Act, therefore, do not restrict the separate and distinct grant of power effected by the AUMF.
C.
I am left with a simple set of facts: the AUMF grants the President, who already has some inherent Article II power to wage war, see, e.g., Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 109, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (“The President ... possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation’s organ in foreign affairs.”), the power to use necessary and appropriate force against organizations and persons with a role in the September 11 attacks; the Supreme Court has stated that military detention is a “fundamental incident of waging war,” Hamdi, 542 U.S. at 519, 124 S.Ct. 2633; and, the Government alleges that al-Marri has been a member of al Qaeda since at least 1996. I think it clear under these circumstances that al-Marri can be detained as an enemy combatant and agree with the separate opinions of Judge Traxler, Judge Wilkinson, and Judge Niemeyer that so hold. As the Court wrote over half a century ago,
[T]he detention and trial of petitioners— ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger — are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted.
Quirin, 317 U.S. at 25, 63 S.Ct. 2.
Finding no such “clear conviction,” particularly given that the President is acting in concert with Congress, I would hold that the President, operating pursuant to the AUMF, had the power to detain al-Marri as an enemy combatant.
II.
I do not agree, however, with Judge Traxler’s separate concurrence, which concludes that a remand is necessary to permit al-Marri to further challenge his detention. Instead, because al-Marri short-circuited the lower court’s attempt to craft procedures meant to protect his due process rights, I would not reward his refusal to participate with a remand. To the contrary, the magistrate judge and district court judge are to be commended for the extent to which they responded to al-Mar-ri’s concerns, and, indeed accommodated his only specific request. In order to explain this conclusion, I briefly revisit the proceedings below.
*289 A.
On July 8, 2005, the district court entered an order concluding that al-Marri could be detained as an enemy combatant and referring the case to the magistrate judge for development of the appropriate procedures.[7] On August 15, the magistrate judge held a telephonic conference with the Government and al-Marri’s attorneys to discuss what procedures might be used in determining whether al-Marri was an enemy combatant. During the hearing, the magistrate judge requested that both parties “brief ... the question of whether the Government’s affidavit in this case is entitled to the presumption, as outlined in Hamdi, and if so, what must the petitioner do to rebut the presumption.” (J.A. at 154.)
Following briefing from the parties, the magistrate judge entered an order on December 19, 2005, setting forth suggested procedures for addressing al-Marri’s detention. Citing to Hamdi, the magistrate judge concluded “it appears that in the context of a classification of an individual as an enemy combatant by the Chief Executive, due process requires the petitioner receive notice of the factual basis for his classification, and a fair opportunity to rebut the government’s factual assertions by presenting more persuasive evidence before a neutral decisionmaker.” (J.A. at 182.) To this end, the magistrate judge indicated it would “review the government’s credible evidence in the form of affidavits, such as the Mobbs Affidavit in the Hamdi case,” and then would review “any responsive rebuttal evidence in the form of affidavits and documents” from al-Marri. (J.A. at 182.) The magistrate judge also noted “[additional guidance by the court in Hamdi indicates that presumption in favor of the government may be appropriate and hearsay may need to be accepted.” (J.A. at 179.) Thereafter, however, the magistrate judge made no further use of the word “presumption,” and instead explained that “[i]f the petitioner is unable to produce more persuasive evidence than that produced by the government, the inquiry will end there.” (J.A. at 183.) If, however, al-Marri put forth “more persuasive evidence than that produced by the government,” something more akin to a “full-blown adversarial hearing” would occur. (J.A. at 183 (emphasis added).)
In describing the protections that might attend to such a hearing, the magistrate judge noted, for instance, that objections under the Federal Rules of Evidence to material “gathered on the field of battle,” might be inappropriate but “might lie as to domestic evidence obtained by law enforcement in the course of the war on terror.” (J.A. at 184.) After finding that the Government had indeed provided al-Marri notice of the factual basis of his classification in the form of the Rapp Declaration, the magistrate judge concluded the order by requiring al-Marri to file “any rebuttal evidence within sixty days.” (J.A. at 184.)
After the district court withheld ruling on the magistrate judge’s order until the procedures before the magistrate judge concluded, al-Marri filed a response to the magistrate judge’s order, stating that, without being permitted to review the Rapp Declaration in full, he was unable to respond as required by the December 19, 2005 order. The magistrate judge agreed, and on April 5, 2006, the Government filed a declassified copy of the Rapp Declaration. On May 4, 2005, al-Marri filed his *290 response, contending that “he is unable to disprove the allegations contained in the Rapp declaration because he has been denied the opportunity to see the evidence upon which the allegations are based.” (J.A. at 231.) The response further stated that al-Marri “has denied” and “continues to deny” the Government’s allegations. (J.A. at 230-31.) Al-Marri’s response concluded by noting that “Petitioner respectfully declines at this time the Court’s invitation to prove his own innocence, a burden that is unlawful, unconstitutional, and un-American.” (J.A. at 231.)
The magistrate judge entered a Report and Recommendation on May 8, recommending dismissal of al-Marri’s § 2241 claim. It began by referencing its earlier order and summarizing the Rapp Declaration, explaining that the “issue here is which is more persuasive on the issue of whether the petitioner falls outside the enemy combatant criteria, the government’s credible evidence or the responsive rebuttal evidence which the petitioner wishes to present, with special attention to the ‘risk of erroneous deprivation.’ ” (J.A. at 243 (emphasis added).) The magistrate judge proceeded to note al-Marri’s statement that he declined “at this time” to submit evidence and his attendant failure to put forth anymore than a general denial of the Government’s allegations.
It summarized: “Al-Marri brought this action and has now refused to participate in a meaningful way. As a result, there is nothing specific before the court to dispute even the simplest of assertions which al-Marri could easily dispute, were they not accurate.” (J.A. at 244.) For example, “Al-Marri presented] no information concerning his graduate studies and [did] not dispute or offer easily obtainable evidence to counter the assertion that by December 2001 he had rarely attended classes and was in a failing status.” (J.A. at 244.) The magistrate judge expressed frustration with al-Marri’s failure to engage “fact-finding procedures that are intended to be both prudent and incremental,” (J.A. at 248), and recommended that al-Marri’s § 2241 petition “be dismissed,” (J.A. at 249.) In so doing, the magistrate judge concluded that “it appears to the court that the Executive Declaration is more persuasive than Petitioner’s general denial ... and there is no basis for concluding that an erroneous deprivation has occurred.” (J.A. at 248.)
Following a de novo review, the district court adopted the magistrate judge’s Report “to the extent” it was consistent with the district court’s order. (J.A. at 355.) In analyzing al-Marri’s petition, the district court concluded that the framework created by Hamdi applied, that it would entertain a presumption in favor of the Government’s evidence, and that once the Government put forth credible evidence the burden moved to al-Marri to “rebut that showing with more persuasive evidence.” (J.A. at 347 (internal quotation marks omitted).) The district court first discussed the Rapp Declaration and rejected al-Marri’s contention that, at the preliminary fact-finding stage, the Government could not rely on a hearsay declaration; it determined that “hearsay may be used to satisfy the Government’s burden of providing an alleged enemy combatant with notice of the factual allegations against him.” (J.A. at 349.) The Rapp Declaration was thus permissible “at the initial phase,” (J.A. at 349) and the district court expressly noted “[wjhether the Rapp Declaration would be admissible during the later phases of such a proceeding is not a question before the Court today.” (J.A. at 351.)
The district court found that the Rapp Declaration “met [the Government’s] burden of providing a factual basis in support *291 of [al-Marri’s] classification and detention as an enemy combatant.” (J.A. at 352.) The district court, like the magistrate judge, then recounted al-Marri’s complete refusal to offer anything more than a general denial. Finding that al-Marri’s “stance ... ignores his responsibility to prosecute this habeas action,” the district court then ordered the dismissal of al-Marri’s § 2241 petition. (J.A. at 354.)
B.
In Hamdi, the Court provided three avenues of guidance for lower courts when considering future enemy combatant cases. First, the Court noted that due process requires that an “enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government’s factual assertions before a neutral decisionmaker.” Hamdi, 542 U.S. at 533, 124 S.Ct. 2633. Second, the Court noted that “ § 2241 and its companion provisions provide at least a skeletal outline of the procedures to be afforded a petitioner in federal habeas review.” Id. at 525, 124 S.Ct. 2633. Thus, “Congress envisioned that habeas petitioners would have some opportunity to present and rebut facts and that courts in cases like this retain some ability to vary the ways in which they do so as mandated by due process.” Id. at 526, 124 S.Ct. 2633. Finally, the Court explained that whatever process is to be utilized, it must be carried out with “caution,” and be “both prudent and incremental.” Id. at 539, 124 S.Ct. 2633.
In this case, the magistrate judge, and later the district court, attempted to follow those guiding principles. First, both the magistrate judge and district court remained ever-cognizant of Hamdis command that the enemy combatant be provided notice and an opportunity to be heard, structuring the proposed procedures around that command. I see nothing in Hamdi that forbids a sworn statement— like the Rapp Declaration — from providing sufficient “notice” of the allegations against al-Marri. Moreover, as noted, the magistrate judge required the Government to provide al-Marri the declaration in response to his request.
With respect to the Supreme Court’s guidance that the process resemble customary habeas review, the procedures the magistrate judge proposed for handling the initial stage of the proceedings — which the district court later adopted in substantial part — in many ways mirrored traditional habeas practice under 28 U.S.C.A. § 2254 and § 2255 by requiring both parties to put forth affidavits and other materials for an initial determination of which party’s presentation was more persuasive.
In this regard, the initial procedures adopted by the magistrate judge also hewed to the common precept that “the habeas petitioner generally bears the burden of proof.” Garlotte v. Fordice, 515 U.S. 39, 46, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995); see, e.g., Vega v. U.S., 493 F.3d 310, 319 (3d Cir.2007) (noting in adopting rule for sentencing credit cases under § 2241 that “[a]s with any habeas petition, this test puts the initial burden on the prisoner to show his right to relief’). Again, this approach appears consistent with the guidance provided in Hamdi, that § 2241 and its companion provisions may provide an outline for how to proceed in enemy combatant cases.
Finally, and most importantly, Hamdi stressed the need for a “prudent” and “incremental” process. The magistrate judge proposed just that, outlining an iterative process in which al-Marri failed to participate “in any meaningful way.” (J.A. at 244.) Indeed, as the magistrate judge noted, al-Marri refused to deny allegations in the Rapp Declaration that were pecu *292 liarly within al-Marri’s knowledge. He failed to dispute even the assertion that he was performing poorly in school. It is simply beyond the pale for al-Marri to contend that he was unable, without further discovery from the Government, to put forth evidence that he did or did not attend class. By failing to participate, Al-Marri simply short-circuited the entire “incremental” process.
I am unwilling to criticize the lower courts for, in essence, failing to be more creative. Hamdi is the only Supreme Court case providing any guidance on ha-beas procedures in enemy combatant cases, so it was only natural for the lower courts to start with Hamdi’s framework. The magistrate judge was faced with al-Marri’s position that only a criminal trial was adequate — a position that overlooked the fact that, under Hamdi, once the detention question is answered in the affirmative, it a fortiori follows that a criminal trial is not required. The magistrate judge reiterated its concern with al-Marri receiving a factual basis for his classification and having the opportunity to respond before a neutral decisionmaker. The magistrate judge then set forth a proposed two-stage process similar to the normal procedures of a habeas action that would have, if fully implemented, given al-Marri procedures far beyond those adopted in Hamdi, including discovery. But this process was not implemented fully precisely because al-Marri refused to participate in the proceedings, proceedings that contemplated the active participation of al-Mar-ri — the habeas petitioner. Thus, it is because of al-Marri’s own actions that we are here today, unsure of how those procedures would have worked. Given that the procedural posture of this case is a result of his own intransigence, I would not reward al-Marri, the petitioner and the party with the burden of prosecuting his habeas action, with a remand.
Judge Trader, in contrast, believes the real problem is that the magistrate judge and district court engaged in a presumption in favor of the Government’s evidence. Indeed, after recounting the detailed allegations of the Rapp Declaration, the district court “[a]fford[ed] this evidence a favorable presumption,” (J.A. at 352), and found that the Government had met its initial burden, shifting the burden to al-Marri to rebut the Government’s factual case against him. This “presumption” was nothing more than a finding that the Government’s evidence was sufficient to move to the next step in the “incremental” fact-finding process-a process common to traditional habeas practice and embraced by Hamdi as the recipe for future cases. Beyond this initial stage, we simply do not know how the Government’s evidence would have later been treated by the district court had al-Marri not declined to participate from the start.
C.
In sum, I am certainly sympathetic to the concerns laid out by Judge Trader that American citizens and resident aliens apprehended and detained on American soil have access to procedures to safeguard their due process rights, and I would likely view this case quite differently if I believed that the magistrate judge had presumed al-Marri to be an enemy combatant from the start. I likewise find merit in Judge Wilkinson’s position that we not force the Government to release information bearing on national security unnecessarily. I simply find it unnecessary, in al-Marri’s case, to try to strike this delicate balance. The magistrate judge suggested an “incremental” procedure that mirrored traditional habeas actions and would have, had al-Marri simply supplied “more persuasive” evidence in the form of affidavits and docu *293 ments, ultimately provided al-Marri with process far beyond that required by Ham-di In that context, al-Marri’s total refusal to assist the magistrate judge is inexcusable. Because al-Marri has “hoist[ed] [himself] with his own petar,” William Shakespeare, Hamlet Act 2, sc. 2, I would not remand the case for further proceedings.
III.
I would thus affirm the district court’s denial of al-Marri’s § 2241 petition.[8]
Judge DUNCAN has authorized me to indicate that she joins in this opinion.

. In light of Boumediene v. Bush, - U.S. -, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), I agree with the plurality opinion that we have jurisdiction over al-Marri's 28 U.S.C.A. § 2241 (West 2006 & Supp.2007) petition.

. Because the separate opinions have spelled out the details of the allegations in the Rapp Declaration, I do not repeat them here.

. Indeed, the practice of detaining enemy combatants militarily predates our Constitution. See Ex Parte Quirin, 317 U.S. 1, 31, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (noting that "[s]uch was the practice of our own military authorities before the adoption of the Constitution, and during the Mexican and Civil Wars.”).

. While I understand al-Marri's concern that, taken to its extreme, the AUMF’s reference to organizations or persons who "aided in” the September 11 attacks might produce absurd results, I do not believe we need linger on that concern in this case. According to the Rapp Declaration, al-Marri is a member of al Qaeda, which "planned,” "authorized,” and "committed” those attacks.

. I therefore need not address whether, if our military remained only engaged in the conflict in Iraq, al-Marri’s ongoing detention would be permitted under the AUMF.

. Indeed, as I understand al-Marri’s argument, if Osama bin Laden had been captured after September 18, 2001, but before actual military operations in Afghanistan took place, he, too, would not be subject to military detention.

. Because of this assignment by the district court, my discussion focuses in large part upon the actions of the magistrate judge.

. Although I, like Judges Wilkinson, Niemeyer, and Duncan, would decide this case differently than the plurality (Judges Michael, Motz, King, and Gregory) and Judge Traxler, I want to express my deepest respect for their views. My colleagues’ efforts in this case are to be commended.